[S.F. No. 24362. Dec. 10, 1982.]

JAMES RICHARD ODLE, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

934

## COUNSEL

William E. Gagen, Jr., Merrill, Thiessen & Gagen and William T. Lowe for Petitioner.

Quin Denvir, State Public Defender, as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, W. Eric Collins and John B. Moy, Deputy Attorneys General, for Real Party in Interest.

## OPINION

KAUS, J.—

I

An information charges James Richard Odle with two counts of murder (Pen. Code, § 187), four counts of assault with a deadly weapon on a peace officer (Pen. Code, § 245, subd. (b)), three counts of auto theft (Veh. Code, § 10851), and counts of kidnaping (Pen. Code, § 207) and possession of a firearm by a felon (Pen. Code, § 12021). Special circumstances are alleged in connection with the murder counts.[1] There is no indication that the prosecution will not seek the death penalty. Odle's nephew Brian, originally charged with Odle on one of the murders, was granted a severance.

---

[1]There are allegations as to both murders under Penal Code section 190.2, subdivision (a)(3) that the accused is convicted of more than one first or second degree murder; as to one of the murders it is alleged under section 190.2, subdivision (a)(5) that the murder was committed to avoid arrest or escape custody and under section 190.2, subdivision (a)(7) that the victim was a police officer.

Odle twice moved for change of venue on the ground that there was a reasonable likelihood that he could not receive a fair trial in Contra Costa County because of widespread and prejudicial publicity. The first motion was denied on March 13, 1981.[2] A second motion, following the appointment of new counsel, cited continuing pretrial publicity and brought to the court's attention our decision in *Martinez* v. *Superior Court* (29 Cal.3d 574 [174 Cal.Rptr. 701, 629 P.2d 502]), decided on June 18, 1981. The second motion was denied on August 25, 1981.[3]

Odle then petitioned for mandate to compel the trial court to grant a change of venue. An alternative writ has issued and trial has been stayed pending resolution of this proceeding.

II

Charges against Odle stem from the stabbing death of Rena Aguilar on April 30, 1980, and the shooting death of Floyd Swartz, a Pinole police officer, on May 3, 1980, as Swartz attempted to apprehend Odle. Immediately after the shooting of Officer Swartz, there ensued an intense police manhunt involving over a hundred East Bay police officers, a SWAT team, and dogs. An area of Pinole was cordoned off while Odle was sought in a wooded creekbed. After five hours he was apprehended without resistance. The People concede that the "police siege" received multimedia coverage and attracted 100 to 150 spectators, but they dispute Odle's statement that the spectators cheered when he was placed in the police car or that the spectators called on the police to kill him.

---

[2]By written decision on denial of the motion, the trial court noted the presence of some of the indicia of unfairness, namely that the crime was of a revolting nature, media coverage was extensive, and the community in which it occurred had reacted with fear and hostility. However, the community from which the jury would be drawn was neither small nor provincial; the defendant was not a stranger there; media reports had contained no confessions or incriminating statements; and the victims were private persons of no particular prominence. With respect to media coverage, the court noted that although initial publicity had been "extensive, repetitive, and broad in scope," recent coverage had been "infrequent and factual." Coverage as a whole had not been "excessive or sensationalized" and, on the whole, had been "factual, restrained, and responsive." The court also observed that a year and a half had elapsed since the period of intensive coverage, "dulling the effect of any inappropriate media coverage." Finally, the court noted, the Contra Costa County courts have been going "one step beyond" the *Hovey* (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]) requirement of sequestered voir dire and have been conducting voir dire in sequestration "on all aspects of the nature and extent of the publicity and how, if at all, it may affect each potential juror."

[3]The second opinion concluded that the continuing publicity was neither extensive nor inflammatory and that the facts of *Martinez* were "not even remotely similar to the case at bar" except that in each case the death penalty was sought by the prosecution. The trial court found no "reasonable likelihood" that Odle could not receive a fair and impartial trial in Contra Costa County (Pen. Code, § 1033).

The parties agree on the general principles of law and the standard of appellate review. We restated them recently in *Martinez* (29 Cal.3d at pp. 577-578): ■ "On a pretrial writ, as on appeal from a judgment of conviction, the appellate court must make an independent evaluation of the circumstances surrounding a defendant's claim for change of venue and must satisfy itself de novo that a fair trial is or was obtainable in the county of original venue. . . . The standard to guide the reviewing court finds expression in *Maine* [*Maine* v. *Superior Court* (1968) 68 Cal.2d 375 (66 Cal.Rptr. 724, 438 P.2d 372)]: ■ ' "A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. . . . A showing of actual prejudice shall not be required." ' . . . The phrase 'reasonable likelihood' denotes a lesser standard of proof than 'more probable than not.' . . . Further, when the issue is raised before trial, any doubt as to the necessity of removal to another county should be resolved in favor of a venue change."

■ In *Martinez* and its predecessors we identified the indicators of potential prejudice in pretrial publicity. They include the nature and extent of the news coverage, the size of the community, the nature and gravity of the offense, and the respective standings of the victim and the accused in the community. (*Martinez, supra,* 29 Cal.3d at p. 578.)

■ The parties agree—and the trial court found—that in the two weeks of May 1980 after the officer's death, the media coverage was extensive throughout the Bay Area. The parties also agree that Contra Costa is large in terms of population and geography; what is disputed is its "character" and the issue whether size alone—without large metropolitan centers—can dissipate potential prejudice. It also appears settled that there were no publicized confessions of the accused or his codefendant and that no political controversy surrounds the case or its participants.

The parties rely principally on two cases: Odle on *Martinez* v. *Superior Court, supra,* 29 Cal.3d 574, and the People on *People* v. *Harris* (1981) 28 Cal.3d 935 [171 Cal.Rptr. 679, 623 P.2d 240]. In *Martinez* we found a reasonable likelihood that a fair trial could not be had in Placer County where, although not inflammatory or highly sensational, extensive publicity continued for over a year before the change of venue motion, climaxing during the trial of Martinez' alleged accomplice. We stressed that the county was relatively small and rural. Although we declined to adopt a special rule giving rise to a presumption in favor of a requested change of venue in any capital case in which there has been extensive publicity, we held that the gravity of the crime charged was a most significant factor and that the rule that all doubts be re-

solved in favor of changing the venue took on particular significance. Odle urges that the instant case is similar to *Martinez* and requires the same result.

The People, on the other hand, compare this case with *Harris* where, despite highly sensational and inflammatory publicity, the trial was had in the community where the crime occurred. In that case the size of the community—San Diego, statewide third in population—tipped the balance against change.

Yet, each case must be decided on its own facts. With that truism in mind we examine the record and attempt to isolate the factors which should affect our determination.

### III

*Size of Community.* Size of community was the primary factor relied on by the trial court in denying a change of venue and is the major thrust of the People's opposition in this court. Contra Costa County, by latest available figures, has a population in excess of 666,000. Pinole has a population of under 15,000—just about 2 percent of the county's population. One of the larger counties in the state and part of the San Francisco metropolitan area, Contra Costa is served by the metropolitan newspapers as well as the local and regional press. Although made up primarily of small cities and towns, like other counties—i.e., Marin and San Mateo—that border major urban communities, Contra Costa is as much suburban as rural. Its population is diverse. In the western portion, where the crimes occurred, the county is urban-industrial, the home of commercial and transport facilities of several major oil companies. That portion—including Richmond and Martinez, the county seat—constitutes almost one-third of the county's population. The central portion, in the eastern foothills of the coast range, which includes Lafayette, Orinda and Walnut Creek, is primarily suburban and has more than one-half of the county's population. The eastern portion, bordering on the San Joaquin Valley, is rural and has a population of less than 100,000.

Odle points out that venue changes have been granted from larger California counties[4] and urges that size alone should not be the touchstone. We agree that "population size alone is not determinative" (*Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 52, fn. 1 [84 Cal.Rptr. 135, 465 P.2d 23]), but in weighing the factors as we must, we are inclined to weigh the factor of community size in favor

---

[4]From Los Angeles County in *Smith* v. *Superior Court* (1969) 276 Cal.App.2d 145 [80 Cal.Rptr. 693]; from San Mateo County in *Steffen* v. *Municipal Court* (1978) 80 Cal.App.3d 623 [145 Cal.Rptr. 782]. The People distinguish the *Smith* case as involving a countywide political issue (charges of bribery and lying to the grand jury became enmeshed in the mayoralty campaign and the matter was of national interest, resulting in a Pulitzer Prize for a newspaper expose). *Steffen* involved charges of prostitution which had received countywide notoriety.

of the People. Whether it controls must await examination of the remaining data.

*The Nature and Extent of Publicity.* In the two weeks following the killing of Officer Swartz, press and other media coverage was extensive. There was television coverage of the manhunt and apprehension of Odle. Thereafter television and radio coverage ceased, and, essentially, so did the coverage by the San Francisco dailies. The East Bay papers, however, continued to report on the pretrial proceedings and developments, up to and including the requests for change of venue.[5] Local and regional papers covered the funeral of the slain officer and have reported on the progress of a memorial fund set up for his family.

Odle submitted over 150 newspaper articles in support of his motions. Because of the number of papers involved, the articles are necessarily repetitive. Odle points to several facets of the reporting in this case which, he claims, is different from the "run of the mill" murder case. He notes that his name was used in headlines more than 70 times, indicating an expectation of name recognition and establishing him as a notorious person. He also finds in the articles an inordinate interest in all pretrial motions and proceedings, including, for example, the circumstances surrounding the substitution of attorneys. However, despite the fact that the capital aspect of the case is mentioned in almost every article, the reporting is no different in degree or intensity than the usual reporting of other homicides of the kind involved here. While several articles contained information that might be potentially prejudicial, they received very limited circulation, and the reporting on the whole was not inflammatory, sensational, or hostile. As we noted in *Martinez,* however, the controlling consideration is whether the net effect of the coverage was to suggest to persons who are potential jurors that Odle was the actual killer. (29 Cal.3d at p. 580.)

Unlike in *Martinez,* no press reports in this case stated the prosecution's belief in Odle's guilt, and the level of hostility observed in other cases—*Harris,* for one—is absent. However, the net effect of the continuing publicity un-

---

[5]Principal Contra Costa County papers are: The Contra Costa Times, a countywide newspaper with circulation of approximately 100,000 (6 days a week); Antioch Ledger, a daily with circulation of 14,000; West County Times (Pinole), published twice a week, circulation 41,000; San Pablo News, a weekly, circulation 27,000; North East Bay Independent and Gazette, published in Richmond 6 days a week, circulation 35,000; Martinez News-Gazette, 5 days a week, circulation 10,500.

The other East Bay papers are the Oakland Tribune (circ. 50,000) and the Berkeley Daily Gazette (circ. 15,000), published in Alameda County.

The above figures and review of the original of articles submitted by petitioner suggest that persons in the western portion of the county have been exposed to continuing pretrial coverage, whereas the central portion, with more than half the population of the county, has received much less publicity.

doubtedly tended to focus attention on the prosecution's view of the case which, at least insofar as the officer's death was concerned, left little to the imagination. As to the girl's murder, on the other hand, the facts were related on only two or three occasions in only two or three articles. It was noted that she was attacked and stabbed in her home, placed in a stolen van from which she managed to escape, and that she died on the front porch of a neighbor's house. Odle and his nephew were the alleged assailants, but the reports did not dwell on incriminating details or motive.

We agree with the trial court that because of the passage of time after the initial period in the spring of 1980, the nature and extent of the news coverage alone does not compel a change of venue.

*Status of the Accused.* Pertinent to this factor is whether Odle was viewed by the press as an outsider, unknown in the community or associated with a group to which the community is likely to be hostile. Odle had served some time in prison and several articles noted that he was an "ex-convict" and a parolee. Certain reports suggested mental instability on his part.[6] He had appeared in shackles in an unrelated burglary case, and the press reported on his attempts to avoid shackling and restraint during the pending murder trial. The press also reported on an aborted escape attempt and that Odle brought a civil suit in July of 1981 against the county alleging brutality on the part of deputies at the county jail in Martinez. However, as the People note, Odle is not an outsider; he has been a resident of Contra Costa County for 30 years and has lived and worked there all of that time. Nor has the press portrayed him as a "foreigner." While the family of his nephew—and former codefendant—has reportedly abandoned Odle,[7] there is nothing to indicate that he is "friendless" or without other familial support.

*The Status and Prominence of the Victims.* The trial court found that "the victims were essentially private persons and could not be classified as prominent as the term is used in the case law." While this characterization is correct as to both victims before their deaths, it fails to take into consideration that the slain officer, by virtue of the events and media coverage after the crimes, became a posthumous celebrity, at least in the western portion of the county where the crimes took place. Newspaper articles reveal that the officer and his family[8]

---

[6]His ex-wife reported to the press that he had part of his brain removed after an accident.

[7]During the preliminary hearing on the charges against Odle and his nephew, one article, relying on "anonymous sources" within their family, provided a vivid reconstruction of the murder of the young woman. Contained in the article was a statement, allegedly made by Odle and relayed to the "anonymous source," which, if made, would indicate total callousness on Odle's part. The article appeared on Saturday, July 25, 1980, in the North East Bay Independent and Gazette, a Richmond paper with a circulation of 35,000. The report was carried by no other newspaper.

[8]The officer's wife was pregnant when he died; they had an 18-month-old son, and he had a daughter by a prior marriage.

have been the objects of a great deal of sympathy and interest. He has been uniformly portrayed as a "good cop" who had earned numerous commendations. His funeral, attended by about 1,000 police officers from all over the state, was a civic event in Pinole and received countywide coverage. Schools were closed and flags were flown at half-mast. The Pinole-Hercules Chamber of Commerce named the officer "citizen of the year."

A fund started for the family has raised over $50,000 from contributors all over the state and county. Well publicized benefits were conducted, with proceeds going to the fund. Most of the coverage in this respect has been in the west county press. A number of stories, again largely concentrated in the west county press, reported on a lawsuit brought by a former wife of the officer seeking participation in the fund on behalf of their child.

In sum, the effect of the status and prominence of the two victims on the issue before us is inconclusive.

*Nature and Gravity of the Offense.* As noted above, the circumstances surrounding the death of the young woman received little media attention, although, when referred to, it was portrayed as a "brutal stabbing" and she was described as a young (18 years) mother of a 2-year-old child. The details of the policeman's death—he was shot in the throat or neck as he approached Odle—were seldom related. It was the characterization of the crime as a "cop killing" which sensationalized it in the media, and it was the outpouring of public sympathy for the slain officer and his family that is described in the media reports furnished to us. It is readily apparent that we do not have here the type of multiple and bizarre killings that were the object of media attention in *Corona* (*Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872 [101 Cal.Rptr. 411]) and *Frazier* (*Frazier* v. *Superior Court* (1971) 5 Cal.3d 287 [95 Cal.Rptr. 798, 486 P.2d 694]), to name two. Nevertheless, Odle is charged with the gravest of crimes and faces the gravest of punishments. Capital cases inherently attract media coverage and for that reason "the factor of gravity must weigh heavily in a determination regarding the change of venue." (*Martinez,* 29 Cal.3d at p. 583.)

*Summary.* We have reiterated the relevant criteria and set out the evidence which relates to each; we now assess the material and weigh it in order to determine the likelihood that Odle can receive a fair trial in the county. The publicity was extensive in the first two weeks—in May of 1980—and related principally to the killing of the officer and Odle's apprehension. Thereafter, the only out-of-the-ordinary media attention was given to the fund-raising. Although all proceedings and court appearances were reported, the reports were low-key and not hostile. Most significant, however, is that the publicity after the first few

weeks was concentrated in the three newspapers located in the western part of the county, where the crimes occurred. This part of the county is not only the most urban-industrial part; it also comprises less than a third of the total population of the county from which jurors will be selected. The size of Contra Costa County and the fact that the publicity was not pervasive in a geographic sense is an important factor in this case.[9]

The status of Odle in the community, as well as the status of the young woman who was killed, appear to be neutral factors. Both were residents and essentially unknown until May of 1980. Odle possesses no social or racial attributes which might arouse community prejudice or hostility, and his claim that he is represented in the press as a friendless pariah is not supported by our reading of the news reports. While the officer victim has become a posthumous celebrity, it is evident that it is his status as an officer, killed in the line of duty, that has propelled him to prominence. Communities undoubtedly have special hostility toward "cop killers," but that aspect of the case would follow Odle to whatever community in which venue ultimately resides.

## IV

The crux of this case is its potential for the ultimate imposition of the death penalty. In *Martinez* we rejected the proposal of a special rule to establish a presumption in favor of a requested venue change in capital cases. We concluded that such a rule was not necessary and that the rule for resolution of all doubts in favor of a change of venue was sufficient protection for the accused.[10]

It is, however, difficult to envision an eventual capital case which will not receive extensive media coverage, at least for a short period of time. If the early publicity attendant on a capital case alone suffices to raise a doubt as to the likelihood of a fair and impartial trial, a change of venue would perforce be required in every such case.

---

[9] The People argue that the size of the community was the single factor that "tipped the balance" in *Harris* (28 Cal.3d 935) and that it should be the controlling factor in the instant case. It must be remembered, however, that the decision in *Harris* followed the conviction, and the ruling of the trial court was then supported by the actualities of voir dire, permitting the determination that Harris had not been denied a fair trial.

[10] "We see no need at this time for so drastic a change in the procedural rules for change of venue, and we formulate no special rules for capital cases. First, the matter is more appropriately directed to the Legislature. Second, the existing rule that all doubts should be resolved in favor of a change of venue when ruling on a pretrial motion for change of venue provides both the trial and the appellate court with sufficient flexibility, after consideration of all the evidence, to insure a fair trial in any death penalty case that has been given extensive publicity." (29 Cal.3d 574, 584.)

Time dims all memory and its passage serves to attenuate the likelihood that early extensive publicity will have any significant impact at the time of trial. It also serves to resolve any doubt concerning the likelihood that Odle can receive a fair and impartial trial in Contra Costa County. More than two years have passed since the crimes and the media coverage of May 1980, and additional time will pass before the case comes to trial. We conclude, therefore, that the extensive publicity of the two-week period that followed the crimes, either alone or in combination with the other criteria, does not establish a reasonable likelihood that a fair trial cannot be had in that county; any lingering doubt we may have is dispelled by the amount of time that has passed between the period of extensive media coverage and the prospective trial date.

Our conclusion is necessarily based on the evidence before us at this time. ■ ■ ■ ■ If our perceptions and conclusions are faulty and the voir dire reveals that, in fact, the dissemination of potentially prejudicial material was more widespread than was or could be anticipated, the trial court will have not only the opportunity, but the duty to order a change of venue upon renewed motion of defendant.[11]

■ Mindful that trial courts are understandably reluctant to change venue when the parties and witnesses are in place and jury selection has begun, we stress that the trial court has the authority to change venue in an appropriate case even at that late date. (*Maine* v. *Superior Court, supra,* 68 Cal.2d 375.) Although *Maine* was concerned with the propriety of pretrial review of venue motions, it nevertheless recognized that the motion could be renewed at time of voir dire: "Due regard for the orderly progress of a trial dictates that a defendant apply for a writ of mandate in advance of trial so that, if the application appears meritorious the appellate court pending its own decision can stay the trial court proceeding. If the appellate court denies the application or if appellate review is not sought, defense counsel can continue under the previous practice, to renew his motion for a change of venue during or after the *voir dire* examination of prospective jurors, *and the trial court should order a venue change if the situation so merits.*" (68 Cal.2d at p. 381; italics added.)

Whether ruling on a motion to change venue well before trial or during the voir dire, the standard remains the same—the reasonable likelihood of a fair trial in view of the pretrial publicity. The additional evidence in a determination at voir dire is the jury panel itself. What had been a matter of some speculation

---

[11]While the trial court may take the initiative to entertain a motion for change of venue to secure a fair and impartial trial, it has no statutory authority to change venue on its own motion for that purpose. (*Jackson* v. *Superior Court* (1970) 13 Cal.App.3d 440, 444 [91 Cal.Rptr. 565, 46 A.L.R.3d 290]; *People* v. *Yeager* (1924) 194 Cal. 452, 481 [229 P. 40].) Penal Code section 1033, subdivision (a), provides for change of venue on motion of defendant; a defendant may decide that factors other than pretrial publicity tip the scales in favor of retention of trial in the county of original venue.

at the earlier motion—i.e., the actual extent of exposure of those who are potential jurors—becomes, on a later motion, subject to more precise measurement and evaluation.

■ The primary purpose of voir dire is to determine the competency and qualification of particular jurors to serve (Pen. Code, §§ 1066-1089); the conduct of the voir dire and the qualification of jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal. (*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103].) To find actual bias on the part of an individual juror, the court must find "the existence of a state of mind" with reference to the case or the parties that would prevent the prospective juror "from acting with entire impartiality and without prejudice to the substantial rights of either party." (Pen. Code, § 1073.) ■ The basic common law requirement of entire or strict impartiality expressed in section 1073 has seemingly been modified by section 1076 which permits qualification of a juror who admits exposure to and influence by pretrial publicity, but declares credibly that he can act impartially.[12] Section 1076 thus serves the rule of necessity in permitting impanelment of a jury in those cases where, due to modern methods of communication and news reporting, it would be virtually impossible anywhere in the state to secure a jury with no knowledge or opinion of some sort of a notorious case.

■ While the propriety of a ruling on challenge for cause is governed by the statutes referred to in the preceding paragraph, the ruling on motion to change venue—the analysis of a reasonable likelihood that a fair trial cannot be had in the county—is separate from, and requires a far more searching analysis than, the decision to qualify a particular juror. That each juror is qualified under applicable statutes and, specifically, that no juror fails to meet the criteria of section 1076, is not controlling. (See *Irvin* v. *Dowd* (1961) 366 U.S. 717, 724-725 [6 L.Ed.2d 751, 756-757, 81 S.Ct. 1639].) ■ Resolution of the venue question requires consideration of the responses of jurors who do not ultimately become members of the trial panel as well as those who do. (See *Murphy* v. *Florida* (1975) 421 U.S. 794 [44 L.Ed.2d 589, 95 S.Ct. 2031]; *Irvin* v. *Dowd, supra,* 366 U.S. 717; *People* v. *Tidwell* (1970) 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748].)

---

[12]Section 1076 provides: "In a challenge for implied bias, one or more of the causes stated in section one thousand seventy-four must be alleged. In a challenge for actual bias, the cause stated in the second subdivision of section one thousand seventy-three must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, circulars, or other literature, or common notoriety; *provided,* it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered in the minutes of the court or of the phonographic reporter." (Italics added.)

The role of the voir dire in the determination of potential for prejudice and partiality of the jury is illustrated by the *Irvin* and *Murphy* cases. Although both decisions involved postconviction review to determine whether defendant was denied a fair trial, they provide guidelines for the assessment of the declared impartiality of prospective jurors in a pretrial determination of the likelihood that a fair trial cannot be had.

*Irvin* recognized the reach and effect of the modern communications media ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard") and the need for modification of an absolute requirement of impartiality ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court"). (366 U.S. at p. 723 [6 L.Ed.2d at p. 756].) The court nevertheless examined the entire voir dire record to evaluate independently the testimony of the ultimately impaneled jurors. The court found a pattern of prejudice that was clearly reflected in the examination of a majority of those finally placed in the jury box.

As to the protestation of impartiality, the court stated: "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. *Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.*" (366 U.S. at p. 728 [6 L.Ed.2d at p. 759]; italics added.)

Using the same analysis, the United States Supreme Court upheld the jury selection process in *Murphy* v. *Florida, supra,* 421 U.S. 794, determining that under the totality of circumstances, Murphy was not denied a fair trial. The *Murphy* court reiterated the guidelines for assessing the declared impartiality of prospective jurors. The court noted: "The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality. In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it. In *Irvin* v. *Dowd,* for example, the Court noted that 90% of those examined on the point were inclined to believe in the accused's guilt, and the court had excused for this cause 268 of the 430 veniremen. In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against

petitioner as to impeach the indifference of jurors who displayed no animus of their own." (421 U.S. at pp. 802-803 [44 L.Ed.2d at p. 596].)

Use of the voir dire in assessing the reasonable likelihood of a fair trial in the county of venue is also illustrated by *People* v. *Tidwell, supra,* 3 Cal.3d 62. Although Tidwell was tried before *Maine* and the "reasonable likelihood" standard, the conviction was overturned in large measure because the trial court failed to heed and evaluate the expressions of partiality/impartiality of the prospective jurors. The court concluded: "In sum, this trial had no hope of enforcing procedural guarantees which have been built up over centuries of legal experience. From the outset the entire community from which all participants except the defendant were drawn was familiarized with the details of the prosecution's case by extensive publicity of the progress of the investigation of the murders—including the apprehension of the defendant and the discovery of items in his possession which were linked with the victims. The formalities which would follow—authenticating, offering, and receiving or rejecting items of evidence in the trial—cannot hide *the fact that all 12 jurors had heard news of the case, and many must certainly have been aware of the prosecution's evidence. . . .*" (3 Cal.3d at pp. 75-76; italics added.)

While we have decided that, on the evidence before us, there is no reasonable likelihood that Odle cannot receive a fair trial in Contra Costa County, the actual impact on prospective jurors of the extensive early media coverage remains an unknown quantity. It may be that none of the jurors will have heard or recall the pretrial publicity. Whatever the extent of exposure, however, the trial court will be in the best position to assess its impact on the jury panel as well as to evaluate the declarations of impartiality/partiality by the individual jurors. Further, any danger that examination at voir dire will itself serve to publicize the early reports is minimized by the practice, in Contra Costa County, of an individualized voir dire procedure.[13] (See *People* v. *Rutkowsky* (1975) 53 Cal.App.3d 1069, 1073 [126 Cal.Rptr. 104].)

As we recalled at the outset, in *Martinez* we said that "any doubt as to the necessity of removal to another county should be resolved in favor of a venue change." (29 Cal.3d at p. 578.) We do not deviate from that principle. We do,

---

[13]In this regard, the trial court said: "Lastly and perhaps most significant, the Supreme Court in its recent case of *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, mandated a practice that this Court had been using in all capital cases since 1971 of requiring individual voir dire in sequestration of all potential jurors on issues which involve death, qualifying the jury. This Court has in fact been going one step beyond the holding in *Hovey,* and also conducts its voir dire in sequestration on all aspects of the nature and extent of the publicity and how, if at all, it may affect each potential juror. This is a safeguard that manifestly assures that the defendant can receive a fair trial. It also affords the fullest and broadest inquiry on any other sensitive issue that may exist in a particular trial, without possibly infecting the other members of the jury panel."

however, point out that the necessity of granting a pretrial change of venue based *on speculation* decreases in direct proportion to the readiness of trial courts to fulfill their duty to change the place of trial when actual voir dire reveals *as a fact* that the right to a fair trial so demands.

The alternative writ of mandamus is discharged and the petition for writ of mandamus is denied.

Newman, J., Broussard, J., and Reynoso, J., concurred.

Richardson, J., concurred in the result.

**BIRD, C. J.**—I dissent.

The well-established law of this state mandates that a motion for a change of venue *must* be granted whenever there is *any doubt* that a fair trial can reasonably be held in the county in which a crime is to be tried. (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 577-578 [174 Cal.Rptr. 701, 629 P.2d 502] and cases cited; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 387-388 [66 Cal.Rptr. 724, 438 P.2d 372].)

Here, the evidence raises a *strong doubt* about the likelihood of a fair trial in Contra Costa County. The majority reach the opposite conclusion only by seriously mischaracterizing the nature of the pretrial publicity in this case. In fact, the publicity was hostile and continuous, contained damaging disclosures about the "evidence" against petitioner, and infected most, if not all, of Contra Costa County. Judged by the standards promulgated by this court in past cases and purportedly relied on by the majority here, petitioner has demonstrated that the pretrial publicity about his case necessitates a change of venue.

The majority's conclusion is all the more disturbing in light of the fact that the petitioner faces the possibility of the death penalty. This court has pledged that in capital cases, cases "of utmost gravity" involving "the gravest consequences to petitioner," motions for a change of venue will be given particularly careful consideration. (*Martinez, supra,* 29 Cal.3d at pp. 583-584.) The majority in this case fail to live up to that pledge.

In addition, the majority here sanction a procedure that this court has rejected repeatedly in past cases, and create a virtual presumption that venue need not be changed before voir dire. The result will be a troubling increase in the number of cases tried in counties in which extensive publicity has made a fair trial impossible, and a consequent increase in the number of convictions which will have to be reversed after trial.

I must respectfully dissent from this short-sighted repudiation of the change of venue principles adopted by a unanimous court in *Maine, supra,* 68 Cal.2d 375, and followed consistently until today (see *Martinez, supra,* 29 Cal.3d 574).

I.

This court recently reiterated the standards to be applied to a pretrial writ of mandate seeking to compel a change of venue. (*Martinez, supra,* at pp. 577-578.) The appellate court must make an independent evaluation of the evidence, and must grant a motion whenever " ' " "there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. . . . A showing of actual prejudice shall not be required." ' . . . [A]ny doubt as to the necessity of removal to another county should be resolved in favor of a venue change. [Citations.]" (*Ibid.*) The relevant factors in examining the evidence include "the extent and kind of the publicity as well as the size of the community . . . [,] [t]he nature and gravity of the crime . . . [and] the standing of the victim and the accused in the community. [Citations.]" (*Id.,* at p. 578.)

Petitioner submitted to the trial court over 150 newspaper articles concerning his case, as well as approximately 140 pages of transcripts of television and radio news broadcasts. Much of the publicity was prejudicial to petitioner, either because of its hostility to him and sympathy for the victims, or because it disclosed factual information likely to create a belief in his guilt.

Press coverage of petitioner and his alleged crimes became widespread immediately after the death of Officer Swartz and petitioner's arrest. The media consistently reported that he was apprehended only after a "massive manhunt," complete with scores of police officers, helicopters, dogs and SWAT teams. Although the Attorney General points to one article indicating that the crowd observing the "manhunt" was calm and peaceful, most of the press painted quite a different picture. Television and radio broadcasts and newspaper articles reported that the crowd "yelled for police to kill him," and that the police feared for petitioner's safety after his arrest. One newspaper deemed it appropriate to quote an observer who said, "I hope they blow that sucker to bits. I'd hate to see him walk out of there." The article noted that those around him shared his sentiments. A woman said, "I kind of hoped they'd bring that guy out looking like a piece of swiss cheese." Further, when an officer "prodded" petitioner "none too gently in the back with the end of his weapon, the crowd cheered again." A newspaper reported that a local citizen said, "if he is responsible for the two murders," petitioner "should die."

In the following weeks, the newspaper coverage continued to relate information likely to arouse hostility toward petitioner. His prior record was discussed

at length, including such remote matters as his suspension from high school for fighting. The dispute over whether he should be shackled or otherwise restrained in the courtroom was covered extensively. The sheriff's deputies provided detailed explanations of their fear that petitioner could not be guarded by a single deputy. Police officials were quoted as saying that petitioner was known to them as "super bad."

Petitioner's ex-wife and relatives contributed to the parade of inflammatory publicity, telling the press that he became violent when taking medicine after an accident which resulted in part of his brain being removed, and that he had threatened to harm family members. It was reported that petitioner's ex-wife left him because she knew he would never "straighten up."

At the same time, the press provided extensive coverage of the outpouring of grief and sympathy at Officer Swartz's death. A fund to aid his survivors was established within 24 hours of his death, and quickly raised $50,000. Many articles described his young family—2 children and a 22-year-old wife who was pregnant at the time of his death. He was born and raised in Contra Costa County.

Hundreds of officers attended his funeral. Colleagues and local citizens described him as a model police officer who had had an admirable impact on the lives of those he served. Newspaper coverage of his life and death was revived when the Chamber of Commerce named him Man of the Year, when his first wife sued his widow, demanding a share of the memorial fund on behalf of her child, and again when his third child was born, three and one-half months after his death.[1]

A renewed burst of publicity described the public defender's attempts to withdraw from the case—in terms which strongly implied that the office found the defense of petitioner distasteful.

In addition to publicity likely to inflame the public and arouse hostility toward petitioner, widespread discussions of "evidence" tending to point toward his guilt was equally prejudicial. Here, as in *People* v. *Tidwell* (1970) 3 Cal.3d 62, 70 [89 Cal.Rptr. 44, 473 P.2d 748], "a good deal of the prosecution's case was presented out of court before the trial." The public was informed that Brian Odle, petitioner's nephew, had surrendered to the police in

---

[1] In light of this widespread publicity about Officer Swartz, I fail to understand how the majority conclude that "the effect of the status and prominence of the two victims" on the motion for change of venue "is inconclusive." (Maj. opn., *ante* at p. 941.) Although Aguilar was an ordinary citizen, Swartz was a young, highly respected police officer, killed in the line of duty, whose death prompted a flood of publicity about his life, career and family. Swartz's status is of particular significance since two of the special circumstances charged against petitioner relate specifically to the allegation that he killed a police officer.

the Aguilar homicide. Immediately thereafter, the newspapers reported that the police believed that petitioner, not Brian, had actually stabbed Aguilar.[2] An acting police chief reportedly supplied a motive for this homicide, telling reporters that petitioner killed Aguilar because she overheard his plans to kill another person.

Graphic details of Aguilar's death were printed, including the statement that she was found "screaming and bleeding profusely from numerous stab wounds." A neighbor was quoted as saying, "I saw the stab wounds. I saw her intestines on her stomach and her hair was all matted with blood." The newspapers reported detailed physical evidence linking petitioner to the Aguilar killing—his nephew's wallet left at the scene, bloodstains in a stolen van that petitioner was seen driving, reports that a similar van was observed at the scene of the homicide.

Television, radio and newspaper accounts were even more positive in stating that petitioner had killed Officer Swartz. Lengthy eyewitness accounts of the killing were printed. Most of those said that Swartz was killed while trying to arrest Odle—thus resolving the issue underlying one of the special circumstances allegations (Pen. Code, § 190.2, subd. (a)(5), charging that the murder was committed to avoid arrest). Again, physical evidence linking petitioner to the homicide was reported in detail.

"When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt. [¶] Indispensable to any morally acceptable system of criminal justice is a verdict based upon evidence and argument received in open court, not from outside sources. When community attention is focused upon the suspect of a spectacular crime, the news media's dissemination of incriminatory circumstances sharply threatens the integrity of the coming trial. The prosecution may never offer the 'evidence' served up by the media. It may be inaccurate. Its inculpatory impact may diminish as new facts develop. It may be inadmissible at the trial as a matter of law. It may be hearsay. Its potentiality for prejudice may outweigh its tendency to prove guilt. It may have come to light as the product of an unconstitutional search and seizure. If it is ultimately admitted at the trial, the possibility of prejudice still exists, for it had entered the minds of potential jurors without the accompaniment of cross-examination or rebuttal. [¶] The goal of a fair trial in the locality of the crime is practically unattainable when the jury panel has been bathed in streams of circumstantial incrimination flowing from the news media." (*Corona* v. *Superior Court* (1972) 24

---

[2]Thus, although there were no reports of a confession here, there were reports which strongly implied that a codefendant—a relative—had implicated petitioner. (See *Tidwell, supra,* 3 Cal.3d at p. 70.)

Cal.App.3d 872, 877-878 [101 Cal.Rptr. 411], fns. omitted; *Martinez, supra,* 29 Cal.3d at pp. 580-581; *Tidwell, supra,* 3 Cal.3d at pp. 70, 75-76; *Maine, supra,* 68 Cal.2d at p. 384.)

The result of this massive publicity about petitioner, the victims, the brutal nature of the crimes, and the "evidence" tending to point to his guilt, was predictable and understandable. All indications are that the community was shocked and horrified—and that it held petitioner responsible. The reactions of the crowd that gathered to watch petitioner's arrest are one powerful indication of this general attitude. In addition, a Contra Costa County supervisor, in a column that appeared in two county newspapers, said, "Such events stir a passion and hatred for the suspect." A local judge felt it necessary to disqualify himself from petitioner's case because of "the very real prejudice" he had toward petitioner. He said, "I think if he's guilty he's an animal . . . ."

In light of the barrage of prejudicial publicity, and the strong indications of bias and hostility in the community, the majority's conclusion that there is *no doubt* that petitioner can obtain a fair trial in Contra Costa County is unsupportable. Virtually all of the factors relied on in prior change of venue cases are present here: sensational and brutal crimes; inflammatory or prejudicial publicity; widespread discussion of incriminatory evidence; a defendant who lacked even family support and, as an ex-felon with a lengthy record, was of low status in the community; a prominent and respected victim; "pervasive civic involvement in the fate of a victim" (*Maine, supra,* 68 Cal.2d at p. 385); financial disputes relating to the case.

The majority express a fear that if a change of venue is ordered in this case, venue will have to be changed in every capital case. I do not agree. This case involved sensational features which naturally led to extensive publicity: a brutal, gory stabbing, a massive police manhunt, the death of a young, well-respected police officer who was survived by a young family and a pregnant wife.[3]

As Justice Mosk said in *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 295 [95 Cal.Rptr. 798, 486 P.2d 694], "This was not an 'ordinary' homicide, such as all too often occurs in the course of a robbery of a liquor store or a service station, or during a family dispute; we entertain no doubt that the defendants in

---

[3]The majority opinion argues that bias against petitioner as an accused "cop killer" will follow petitioner to wherever his trial is held. (Maj. opn., *ante* at p. 942.) However, in a different county, the members of the jury pool will not have been exposed to extensive out-of-court reports about the details of the killing or about the victim's life and family. Nor will they have lived with this event as a local tragedy, as have the citizens of Contra Costa County. Further, as the Court of Appeal said in *Corona, supra,* 24 Cal.App.3d at page 883, "If perfection is not within reach, optimum conditions are." If petitioner cannot escape the odium associated with the accusation that he killed a police officer, he can at least be tried in a county free from the taint of extensive pretrial publicity.

those cases can receive unbiased trials . . . ." Rather, "[c]ases sometimes occur, and this would appear to be one of them, in which the very enormity of the offense itself arouses the honest indignation of the community to such a degree as to make it apparent that a dispassionate investigation of the case cannot be had. Under such circumstances the law requires that the place of trial be changed." (*People* v. *Yoakum* (1879) 53 Cal. 566, 571.)

I also cannot agree with the majority's assertion that the size of Contra Costa County and the geographic distribution of its populace dispel the presumption of prejudice created by this extensive publicity. The size of the county is but one of the factors which must be considered in evaluating a motion for a change of venue. (*Martinez, supra,* 29 Cal.3d at p. 578.) This court has taken care to emphasize that "a large city may . . . also become so hostile to a defendant as to make a fair trial unlikely." (*Maine, supra,* 68 Cal.2d at p. 387, fn. 13; see also *Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 52, fn. 1 [84 Cal.Rptr. 135, 465 P.2d 23].) The Courts of Appeal have taken this possibility seriously, ordering venue changes from San Mateo County (*Steffen* v. *Municipal Court* (1978) 80 Cal.App.3d 623 [145 Cal.Rptr. 782]) and Los Angeles County (*Smith* v. *Superior Court* (1969) 276 Cal.App.2d 145 [80 Cal.Rptr. 693].)

The decision to require a change of venue turns not on a mechanical measurement of the size of the county, but on an evaluation of the extent of the publicity and the effect it probably had on the community. Population size may help in judging that effect, but it cannot be determinative per se. Larger counties, for instance, may have newspapers with wider circulation—and thus be just as infected by prejudicial pretrial publicity as a smaller county with only a local press.

The majority here admit that three newspapers flooded their readership with publicity about petitioner's case, the Contra Costa Times, the West County Times, and the North East Bay Independent and Gazette. Their assumption that this publicity remained in the western third of the county is not supported by the record.

First, the Contra Costa Times, which covered all aspects of petitioner's case extensively, is a *countywide* newspaper. It is the largest paper in the county, with a circulation of 100,000.[4] Second, although the West County Times and the North East Bay Independent and Gazette are published in the western portion of the county, nothing in the record indicates that they were purchased and

---

[4] The reported population figure for Contra Costa County (666,000) includes children and others ineligible to serve on juries. The number of people in the potential juror pool is much lower. Considering that newspapers are often read by more than one adult in each household, the Contra Costa Times alone probably reached a large percentage of those eligible to serve on the jury in petitioner's case.

read only by residents of those areas. In fact, since the western portion of the county is the industrialized, urban sector, many residents of the suburban and rural areas are probably employed in the west—and carry newspapers purchased there back to their homes.

The majority also rely heavily on the passage of time since the homicides occurred. Petitioner acknowledges that the heaviest barrage of publicity occurred during the weeks immediately following the killings. However, a steady stream of coverage has continued since then. Testimony at the preliminary hearing was printed in great detail. "[E]very procedural step taken" has been reported in depth. (*Fain, supra,* 2 Cal.3d at p. 50.) A number of unusual and highly memorable twists, fully covered in the press, have kept alive the memory of the initial bursts of publicity: Swartz's Man of the Year award; his ex-wife's lawsuit against his widow; the public defender's withdrawal from the case; a lawsuit filed by petitioner against the county, charging police brutality; and the repeated motions for change of venue.

In addition, this continuous coverage of every stage of petitioner's case indicates that future events will be thoroughly reported as well. Thus, it is likely that the Contra Costa newspapers will follow the progress of the case after this court renders its decision, as trial is set and jury selection begins. The detailed, prejudicial information already disseminated throughout the county will be reviewed once more in the press. Prospective jurors will be reminded of any of the details of the case they may have forgotten or overlooked in the past months.

Given this steady barrage of publicity, local residents will not have forgotten what they read and heard about petitioner and the crimes with which he is charged. Since all doubts about the effect of such publicity must be resolved in favor of a change of venue, I think it clear that petitioner has more than amply demonstrated the need for such a change in his case.

The careful application of change of venue principles is of special importance in capital cases. As this court stated just last year, "when a defendant's life is at stake, the rule that all doubts be resolved in favor of venue change, takes on particular significance. Neither an accused whose life hangs in balance nor the authorities charged with enforcing and administering the law should be required to face the possibility of a second trial when, as here, we face acute dangers to an impartial trial and when we can avoid them by the simple expedient of a change of venue." (*Martinez, supra,* 29 Cal.3d at p. 585.)

In addition to the gravity of the offense and its consequences both for the accused and for society, capital cases differ from other criminal prosecutions in

that the role of the jury, if the trial reaches the penalty phase, is dramatically altered. "Just as the sentence of death is unique, so is the role of the penalty jury." (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 771, fn. 34 [175 Cal.Rptr. 738, 631 P.2d 446].) The death penalty jury must "express the conscience of the community on the ultimate question of life or death." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 519 [20 L.Ed.2d 776, 783, 88 S.Ct. 1770], fn. omitted; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 73, fn. 122 [168 Cal.Rptr. 128, 616 P.2d 1301].) "[O]ne of the most important functions any jury can perform in making such a selection [between life and death] is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' [Citation.]" (*Witherspoon, supra,* 391 U.S. at p. 519, fn. 15 [20 L.Ed.2d at p. 783].)

Where a death penalty case is tried in a county in which there has been extensive publicity, a significant proportion of the community will become ineligible to serve on the jury. Those excused because of their exposure to pretrial publicity are likely to be the most honest, self-aware, and informed members of the jury pool. (See *People* v. *Harris* (1981) 28 Cal.3d 935, 983 [171 Cal.Rptr. 679, 623 P.2d 240] [dis. opn. of Bird, C. J.].) "Whatever the impact of the removal of these jurors upon the guilt determination, the impact on the penalty phase is likely to be devastating. At that phase, where jurors are given the most discretion and where the jury verdicts are supposed to express that undefinable quality known as the conscience of the community, the law removes from the jury those who are most informed about the community." (*Ibid.*)

A simple change of venue would remove this obstacle to a fair, representative guilt and penalty phase jury. That remedy should be used here. "Why courts should hesitate to grant a change of venue in a proper case, I cannot understand. . . . [Is] it feared the defendant would escape if he were allowed a fair trial?" (*People* v. *Suesser* (1901) 132 Cal. 631, 635 [64 P. 1095].)

## II.

In addition to misapplying settled standards governing motions for change of venue, the majority opinion errs in establishing a new procedure for trial court and appellate review of such motions. Although at one point the opinion purports to intend no change in the well-established law, specific language in part IV, as well as the overall thrust of the discussion, makes it clear that a substantial change will inevitably result from today's decision.

The majority assert that they "do not deviate" from the principle that any doubt as to the necessity for a change of venue should be resolved in favor of

the motion, whether the request is raised before or after voir dire. (Maj. opn., *ante* at p. 946.) At one point the majority seem to indicate that they are doing no more than reiterating what was said in *Maine, supra,* 68 Cal.2d at page 381—if a motion for a change of venue is denied before voir dire, the trial court has authority to reconsider the motion after jury selection. (Maj. opn., *ante* at p. 943.)

However, language elsewhere in the opinion belies this claim of adherence to the settled rule. The majority opinion discusses with apparent approval the advantages of considering a change of venue motion only after voir dire. At that time, according to the majority, the decision can be based on "more precise measurement and evaluation" and facts, rather than on "speculation." (Maj. opn., *ante* at pp. 943-944, 946-947.)

As I read this language, the implicit instruction to the lower courts is that decisions on change of venue motions may be postponed until after voir dire. Only when unusual circumstances force the court to change venue immediately must such a motion be granted before jury selection begins. The majority thus appear to establish a preference for resolution of change of venue motions *after* voir dire.

With due respect, such a preference would be impractical, contrary to precedent, and based on an inaccurate perception of the efficacy of voir dire. Further, it would eliminate any possibility of pretrial appellate review of change of venue motions.

The majority indicate that motions to change venue should be renewed after voir dire, so that they can be decided based on "facts" rather than "speculation." Just when does the majority expect the motion to be renewed? During voir dire it will still be premature. Even if the first potential jurors appear to be prejudiced against the accused, there will be no way to determine whether they are atypical or represent a community-wide pattern. However, once voir dire ends, the jury is ready to be sworn. When that happens, jeopardy attaches. To avoid double jeopardy problems, the accused must renew the motion after the completion of jury selection but before the official swearing of the jury—events that usually occur almost simultaneously. And whether the motion is renewed during voir dire, immediately after jury selection is completed, or during trial, there will be no time to prepare the motion, no time to obtain transcripts of voir dire, and, realistically, no likelihood of convincing the trial court to grant the motion.

Moreover, as this court noted in *Maine,* "Experience shows . . . that trial courts are often reluctant to order a venue change after a jury has been empaneled." (*Maine, supra,* 68 Cal.2d at p. 380.) *Maine* authorizes defense counsel to renew their motions after voir dire—but only as a complement to a thorough consideration of the merits of the motions before jury selection begins. Here, the majority implies that post-voir dire consideration of change of venue motions can *replace* serious review of such motions before voir dire. Such a procedure was specifically rejected by *Maine.* (*Id.,* at pp. 380-381; *Clifton* v. *Superior Court* (1970) 7 Cal.App.3d 245, 252 [86 Cal.Rptr. 612].)

Not only is the majority's apparent preference for a post-voir dire motion impractical, it is also based on the discredited notion that voir dire will expose the exact level of prejudice in the community. This court has repeatedly noted that voir dire is often ineffective in uncovering bias. "In an antagonistic atmosphere 'there will remain the problem of obtaining accurate answers on *voir dire*—is the juror consciously or subconsciously harboring prejudice against the accused resulting from widespread news coverage in the community [?]' " (*Maine, supra,* 68 Cal.2d at p. 380.) Even where "all of the jurors selected claim[] the ability to sit impartially, such a claim is of course not conclusive." (*Tidwell, supra,* 3 Cal.3d at p. 73.)

As the Court of Appeal noted in *Corona* v. *Superior Court, supra,* 24 Cal.App.3d at pages 878-879, "Questioned on *voir dire* as to the effect of the media's evidentiary disclosures, one prospective juror may deny or admit awareness, another disclaim or admit prejudgment. One may falsely deny both knowledge and prejudice for the sake of a place on the jury. An honest juror may admit knowledge or tentative prejudgment and find himself excluded. Many will sincerely try to set aside their preconceptions and give assurance of impartiality, yet unconsciously bend to the influence of initial impressions gained from the news media." Continuing in footnote 6, at page 879, the court added, "Authoritative decisions now recognize the lack of realism inherent in expectations that jurors can insulate their verdict from inadmissible knowledge. [Citations.] [¶] When prejudicial publicity has been injected into jurors' consciousness, the courts do not give dispositive effect to jurors' assurances of impartiality. [Citations.] [¶] 'To expect a juror to confess prejudice is not always a reliable practice. A juror can be completely honest in denying prejudice. In the words of Alexander Pope, "All looks yellow to the jaundiced eye." ' [Citation.]"

In addition, there is the danger in any well-publicized case that the very process of voir dire, with its repeated questions about publicity and prejudice, will tend to prejudice the jury. Listening to other jurors' comments and observing the widespread press and community involvement in the case, the jurors are

likely to develop a bias even if they did not harbor one before the commencement of voir dire.[5] (See also *Corona, supra,* 24 Cal.App.3d at p. 881.)

Perhaps the most serious problem with the majority opinion is its failure to acknowledge that postponing serious review of these motions until after voir dire would completely eliminate the possibility of pretrial appellate review of change of venue motions. As the court said in *Maine,* "It would be inopportune . . . to permit a defendant to seek mandamus during or after empaneling the jury. [Citation.] Due regard for the orderly progress of a trial dictates that a defendant apply for a writ of mandate in advance of trial . . . ." (*Maine, supra,* 68 Cal.2d at p. 381.) And just two years after *Maine* was decided, this court reemphasized that a writ of mandate generally is not available after voir dire begins, pointing out that *Maine* "recognized that mandate should lie *only* in advance of jury selection to avoid disruption of the 'orderly progress of a trial . . . .' " (*Tidwell, supra,* 3 Cal.3d at p. 68, italics added.)

Consideration of the practicalities of the situation demonstrates the wisdom of this rule. When the trial court has denied a motion for a change of venue both before and after voir dire, with the trial about to start, how could a defendant possibly seek appellate review? The trial would have to be stayed, at great inconvenience to the jury and witnesses. And what court will issue such a stay, especially if jeopardy has attached? Once again, there will be no time to thoroughly prepare the writ, or even the request for a stay, and no time to review transcripts of the voir dire. Appellate review after the completion of voir dire is barred by the lack of time as well as by the rule enunciated in *Maine* and *Tidwell.*[6]

---

[5]Although the majority opinion notes with approval that the trial courts in Contra Costa County have adopted a process of individual voir dire on questions relating to pretrial publicity, the majority do not hold that such sequestered voir dire is necessary in all cases in which a change of venue is sought. In *Hovey* v. *Superior Court, supra,* 28 Cal.3d at page 81, footnote 137, this court noted that sequestered questioning about the impact of pretrial publicity has not been required. In the absence of such a requirement, I must assume that the procedure suggested by the majority will be used even in counties where sequestered voir dire is not employed.

[6]The majority's apparent preference for post-voir dire motions raises other problems. In many counties, change of venue motions are handled at a pretrial motions calendar, presided over by a judge who is not likely to handle the trial. Hearings on these motions frequently consume considerable court time. Competent appraisal of the often copious exhibits requires still more hours of preparation by the judge in chambers.

The majority's preference for consideration of change of venue motions after voir dire will wreak havoc with these local procedures. Either the trial judge will have to duplicate the motion judge's efforts, reviewing all of the evidence and testimony originally presented with the motion, or the motion calendar procedure will have to be abandoned. Both scenarios are unfortunate. The former will double the time and effort involved in change of venue motions, and the latter will disrupt the orderly processing of criminal cases.

I suspect many courts will respond to today's decision by assigning all such motions to the trial judge in the first instance, to be handled as *in limine* matters. But this procedure will have untoward consequences, too. The start of trial will be delayed—possibly in violation of the speedy trial provisions of Penal Code section 1382. In addition, preconviction appellate review

The majority opinion does not even mention these problems. The obvious result of this decision will be an increase in the number of cases going to trial despite meritorious claims that venue must be changed—and, therefore, in the number of convictions that must be reversed because denial of the change of venue led to denial of the right to a fair trial, "the most fundamental of all freedoms" (*Estes* v. *Texas* (1965) 381 U.S. 532, 540 [14 L.Ed.2d 543, 549, 85 S.Ct. 1628]). However, " 'reversals are but palliatives . . . the cure lies in those remedial measures that will prevent the prejudice at its inception . . . . ' " (*Maine, supra,* 68 Cal.2d at p. 384, quoting *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 363 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507].) Here, the only true cure is the one this court has followed since *Maine:* meaningful consideration of pretrial motions for change of venue *before* voir dire, based on the record of publicity and the inferences about prejudice that can be drawn from that record.

### III.

I must dissent both from the majority's application of standard change of venue principles to this case and from its unwise tampering with the procedure by which motions for venue change should be decided. I would issue the writ.

**MOSK, J.**—I join the dissent of the Chief Justice.

In doing so, however, I cannot be oblivious to the considerable burden on the administration of justice and the cost to the public resulting from the change of venue in a major case. The defendant, the victims, prosecutors, defense counsel, security officers, records and exhibits must be transported from the county of origin to a relatively distant county. Perhaps the most serious problem is inconvenience to the many witnesses, some of whom may have been only fortuitously involved and are resentful. Thus the migration process appears to be improvident, at least compared to an available alternative used in a number of other states.

Instead of moving the case out of the county when there is a substantial likelihood that the public, i.e., available jury panel, has been infected by prejudicial publicity, a more simple and less costly expedient would be to import a jury venire from outside the county, and, if necessary, sequester the selected jury during the course of the trial. This process has been used in Pennsylvania, Washington, Wisconsin, Illinois, North Carolina, Kentucky and New Hampshire. Similar proposals are being considered in a number of other states, in-

---

of the trial judge's ruling will become virtually impossible, although this court has repeatedly recognized that pretrial writ review of change of venue motions is preferable to appellate review of convictions after lengthy trials.

cluding Iowa, Alabama and Florida. North Carolina has permitted this procedure since 1913. (See *Use of Imported Juries Gains in Popularity* (1982) 68 A.B.A.J. 668.)

Since the foregoing proposal and its logistical format require legislative authorization, I cannot do more in the instant case than agree with the views of the Chief Justice. Perhaps the Legislature, after a cost and convenience comparison, will consider the scheme found by other states to be a practical solution.

Petitioner's application for a hearing by the Supreme Court was denied January 19, 1983. Grodin, J., did not participate therein. Bird, C. J., and Mosk, J., were of the opinion that the application should be granted.