[No. B014796. Second Dist., Div. Three. Sept. 24, 1985.]

TRIBUNE NEWSPAPERS WEST, INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE et al., Real Parties in Interest.

444

COUNSEL

Hufstedler, Miller, Carlson & Beardsley, Dennis M. Perluss and Dan Marmalefsky for Petitioner.

De Witt W. Clinton, County Counsel, and Richard E. Townsend, Deputy County Counsel, for Respondent.

Ira Reiner, District Attorney, Brent Riggs, Deputy District Attorney, Geragos & Geragos, Paul Geragos, Berman & Katz, Martin M. Berman, Hecht, Diamond & Greenfield and Roger Jon Diamond for Real Parties in Interest.

OPINION

KLEIN, P. J.—Petitioner Tribune Newspapers West, Inc. (Tribune), the publisher of the Daily News, a newspaper with apparent circulation primarily in the San Fernando Valley area of Los Angeles County, is requesting a writ of mandate ordering respondent the Superior Court of the State of California for the County of Los Angeles (respondent court) sitting in the San Fernando Valley to vacate its order closing a juvenile fitness hearing to the press and public.

The case involves two minors, Michael M. and Mark B.,[1] who are charged with two bank robberies and various other crimes while armed with a dangerous or deadly weapon. The proceedings attracted the attention of the local press because as characterized in one news article, the juveniles "may have belonged to a 'rat pack' of San Fernando Valley rich kids who commit crimes to escape boredom."

Upon motion of the juveniles, respondent court entered an order barring the public from attending future hearings and ordering the press not to contact directly or indirectly any parties present at the hearing. We granted Tribune's request for a temporary stay[2] in order to review the petition and subsequently issued an alternative writ.

---

[1] Mark B. obtained permission to proceed with his fitness hearing with press and public present. Michael M. chose to wait for appellate determination on the public access issue.

[2] After notice of our stay order, respondent court conducted further proceedings and modified its order by changing future hearings to "fitness hearings" and striking that portion of its order prohibiting the press from contacting any party present at the hearings. In view of our stay order, these proceedings were inappropriate.

The record reveals the respondent court did not provide a reasonable opportunity for the public and press to present evidence that there was no reasonable likelihood of substantial prejudice to the right of the accused to a fair trial nor consider viable alternatives against the backdrop of the proper test.

We conclude the respondent court committed an abuse of discretion in closing the fitness hearing in that an improper test for closure was used and all relevant factors were not considered. Therefore, the matter is remanded for a duly noticed hearing on the closure issue to be held, consistent with the views expressed herein.

## DISCUSSION

### 1. *Nature of fitness hearing.*

The fitness hearing is provided for by Welfare and Institutions Code section 707, and its purpose is to determine whether a minor accused of violating a criminal statute is a fit and proper subject to be dealt with under the Juvenile Court Law.[3]

The Legislature has mandated that "members of the public shall be admitted, on the same basis as they may be admitted to trials in a court of criminal jurisdiction, to hearings concerning petitions filed pursuant to Section 602 alleging that a minor is a person described in Section 602 by reason of the violation of any one of the following offenses: [¶] . . . . [¶] (3) Robbery while armed with a dangerous or deadly weapon." (§ 676, subd. (a).)

It has been settled since 1978 when *Brian W.* v. *Superior Court* (1978) 20 Cal.3d 618 [143 Cal.Rptr. 717, 574 P.2d 788], was decided that section 676 applies to fitness hearings. In *Brian W.*, the Supreme Court denied a petition for writ of mandate by a juvenile who had moved to exclude the press from a fitness hearing based upon the finding that said petitioner had failed to establish a "reasonable likelihood" that he would be unable to obtain a fair trial.

The *Brian W.* court found the media coverage had not been excessive or sensational. (*Id.*, at p. 624.) Even substantial publicity where there is a very large pool of potential jurors coupled with appropriate safeguards in the conduct of judicial proceedings was held to "make(s) it highly probable that an impartial jury can be impanelled." (*Id.*, at p. 625.)

---

[3]All further code references are to the Welfare and Institutions Code, unless otherwise indicated.

The Supreme Court also noted that such measures as change of venue, postponement of trial, conducting a searching voir dire, giving clear and emphatic instructions to the jury, and sequestration protect the defendant and insure the constitutionality and fairness of proceedings against him. (*Ibid.*)

Following the discussion in *Brian W.* as to the nature of press access to juvenile hearings, the Legislature amended section 676.

■ The plain language of the amendment indicates a legislative intent to increase access to juvenile hearings. The legislative history supports this conclusion. In numerous documents discussing Assembly Bill No. 1374 (1979-1980 Reg. Sess.), the bill to amend section 676, comparisons were made between the access afforded under *Brian W.* and the additional access which Assembly Bill No. 1374 (1979-1980 Reg. Sess.) would allow.[4]

The Senate Committee on Judiciary stated "[t]he purpose of this bill is to make minors more fully responsible for their crimes, to make juvenile court judges more accountable to the public, and to increase public understanding of the juvenile court system."[5] Moreover, the legislative history indicates that juvenile fitness hearings were intended to be open to the public even in highly publicized cases.[6]

The legislative intent in amending section 676 to provide additional public access to fitness hearings is both in accord with the traditional openness of judicial proceedings and a response to public concern about the increase in criminal activity among young people. As then Attorney General George Deukmejian observed, "Minors are committing more serious and violent crimes than ever before and are becoming more criminally sophisticated. The news media, victims of crime and the public are entitled to have as much knowledge as possible about the juvenile justice system and what it

---

[4]Senate Committee on Judiciary, analysis of Assembly Bill No. 1374 (1979-1980 Reg. Sess.); Assembly Committee on Criminal Justice, Analysis of Assembly Bill No. 1374 (hearing Apr. 30, 1979 and hearing June 21, 1980); Senate Republican Caucus, Third Reading analysis of Assembly Bill No. 1374 (Mar. 31, 1980); California Department of Legal Affairs, Enrolled Bill Report on Assembly Bill No. 1374, by J. Anthony Kline, legal affairs secretary (June 6, 1980); California Department of Youth Authority, Enrolled Bill Report on Assembly Bill No. 1374, by Richard Lew (June 30, 1980); California Assemblyman Gerald N. Felando (author of Assem. Bill No. 1374) letter to California Governor Edmund G. Brown, Jr., dated June 23, 1980).

[5]Senate Committee on Judiciary, analysis of Assembly Bill No. 1374 (1979-1980 Reg. Sess.). Also see letter dated June 23, 1980, to California Governor Edmund G. Brown, Jr., from California Assemblyman Gerald N. Felando (author of Assem. Bill No. 1374).

[6]See Department of Finance Report, Enrolled Bill Report on Assembly Bill No. 1374 (Mar. 27, 1980); Ways and Means Committee Staff Analysis on Assembly Bill No. 1374 (Jan. 23, 1980).

is doing to better serve public safety needs. Obviously, this cannot be accomplished unless the public is informed by timely access to juvenile court proceedings."[7]

The clearly expressed legislative intent in the amendment of section 676 therefore must govern our perspective of the case before us. Notwithstanding this view, we are nevertheless confronted with the meaning of the language used by the Legislature that public admission, including press, should be on the same basis as "trials in a court of criminal jurisdiction." (§ 676, subd. (a).)

Obviously a fitness hearing is not a "trial," nor like a trial in any way. But equally relevant, there are no established standards for closing *trials* in California.

In an effort to fashion a reasonable standard and clarify this ambiguity, we seek direction from several sources. An overview of the historical openness of criminal trials is provided by the United States Supreme Court in two recent cases. (*Richmond Newspapers, Inc.* v. *Virginia* (1980) 448 U.S. 555 [65 L.Ed.2d 973, 100 S.Ct. 2814]; *Press-Enterprise Co.* v. *Superior Court* (1984) 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819].) The United States Supreme Court discussed the important function traditionally provided by open judicial proceedings. Open courtrooms have furnished a significant community therapeutic value, providing a focus for public concern for public safety, and enhancing the integrity of the judicial system. As the plurality opinion in *Richmond Newspapers* observed, the history of openness in judicial proceedings reflects the public's "fundamental, natural yearning to see justice done" and the need for public acceptance and support of the court system. (*Richmond Newspapers, Inc.* v. *Virginia, supra,* at p. 571 [78 L.Ed.2d at p. 986].)

■ The public policy of California also requires open judicial proceedings whenever there is no conflict with a defendant's right to a fair trial. In dealing specifically with preliminary hearings, the Supreme Court proclaimed in *Press-Enterprise Co.* v. *Superior Court* (1984) 37 Cal.3d 772, 780 [209 Cal.Rptr. 360, 691 P.2d 1026] that open hearings "guard against persecution and favoritism, . . ., inspire confidence in the criminal justice system, and serve the cathartic needs of the community."

The conflict between the right of public access and the right of an accused to a fair trial has been considered many times. (See, e.g., *Nebraska Press*

---

[7]Attorney General George Deukmejian, letter in support of Assembly Bill No. 1374 to California Governor Edmund G. Brown, Jr., dated June 27, 1980.

*Assn.* v. *Stuart* (1976) 427 U.S. 539 [49 L.Ed.2d 683, 96 S.Ct. 2791]; *Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368 [61 L.Ed.2d 608, 99 S.Ct. 2898].) In *United States* v. *Brooklier* (9th Cir. 1982) 685 F.2d 1162, the court discussed issues raised during voir dire and certain motions made during trial. There the Ninth Circuit held closure of criminal proceedings requires the accused to establish that closure is "strictly and inescapably necessary" in order to protect fairness of the trial. (*United States* v. *Brooklier, supra,* at p. 1167.)

The *Brooklier* court determined the defendant could discharge this burden by demonstrating a substantial probability that (1) irreparable damage to the right to a fair trial will result from conducting the proceedings in public, (2) alternatives to closure will not adequately protect the right to a fair trial, and (3) closure will effectively protect against the perceived harm. (*Ibid.*)

It has been suggested that *United States* v. *Brooklier, supra,* 685 F.2d at page 1167, should be looked to as a guide, with its test of "substantial probability" of prejudice that press coverage would prevent a fair trial before closure would be permitted.

However, as noted, the California Supreme Court in discussing the same issue but in the context of preliminary hearings, has adopted a standard which requires the defendant to establish "a reasonable likelihood of substantial prejudice after all the evidence is considered" before the preliminary hearing may be closed. (*Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d at p. 782.)

The California *Press-Enterprise Co.* dealt with the appropriate standard to be applied by a magistrate in determining whether the public's right to access to preliminary hearings should be limited due to the risk of impairment of a defendant's right to a fair trial. (*Id.,* at p. 774.) The California Supreme Court therein analyzed Penal Code section 868 before and after its amendment effective March 1982, which amendment now provides that a preliminary examination "shall be open and public."

Penal Code section 868 enables the closing of a preliminary examination on request by the defendant based on a magistrate's finding "that exclusion of the public is *necessary* in order to protect the defendant's right to a fair and impartial trial, . . ." (Italics added.) *Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d at page 779, reasons that because of the legislative history of the amendment and the lack of a definition of "necessary," the Legislature intended the *courts* to determine the appropriate standard, and *Press-Enterprise Co.* did so.

The court concluded: "Once a defendant establishes a reasonable likelihood of substantial prejudice, there is a clear and present danger of prejudice, and the prosecution or media may overcome the defendant's showing by a preponderance of the evidence to the effect that there is no reasonable likelihood of prejudice." (*Id.*, at p. 782.)

In discussing the meaning of "necessary" against the backdrop of the legislative intent which accompanied the amendment of Penal Code section 868 proclaiming that open preliminary hearings would be the rule rather than the exception, the majority opinion, along with the concurring, and the concurring and dissenting ones, found only slight differences in two proposed standards for closure. The two standards considered are "a substantial showing of potential prejudice," and "a reasonable likelihood of substantial prejudice," and the court opted for the latter. (*Ibid.*) However, the concurring opinion stressed that "the determination of 'necessity' must inevitably be a *matter of judgment based on probabilities*, . . ." (*Id.*, at p. 782, italics added.)

It is legally and factually difficult to equate a fitness hearing to a trial. A fitness hearing has a specific purpose very different from that of a trial, *or* a preliminary hearing. Because the standard to be utilized in closing a *trial* to the press has not been fully developed by the United States or the California courts, the directive of section 676 is not of much assistance to the courts, rather like the ambiguity of "necessary" in Penal Code section 868. The standards suggested by the majority and dissent in the California *Press-Enterprise Co.* case are substantially similar, or "[w]hile there is some difference between the two standards, it obviously is not very great." (*Id.*, at p. 781.)

■ Therefore, we conclude that fitness hearings, like preliminary hearings and trials, should be open, unless a minor can establish a *reasonable likelihood of substantial prejudice* to the right to receive a fair and impartial trial. This test has already withstood scrutiny by the California Supreme Court in *Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d at page 782, *Brian W.* v. *Superior Court, supra,* 20 Cal.3d at page 624, and *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 937 [187 Cal.Rptr. 455, 654 P.2d 225], if not as applied to "trials," at least as to situations requiring examination of similar issues and comparable rationales.

2. *The respondent court abused its discretion.*

■ There can be no doubt that "the primary right is the right to a fair trial and that the public right of access must give way where there is conflict." (*Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d at

p. 781.) However, in cases involving closure, the question is whether the court exerted its discretionary power to limit public access in a manner which neither denied nor abridged the freedoms associated with open judicial proceedings. The issue must be resolved on a case-by-case basis after consideration of all relevant factors and all alternatives to closure.

■ Because of the dearth of any evidentiary basis to uphold the ruling, we determine the respondent court abused its discretion in closing the fitness hearing.

a. *No evidence of the circulation of papers with prejudicial publicity.*

There is not one shred of evidence as to the *circulation* of the papers covering the incidents. On this subject, the record reflects that the minor's attorney, Mr. Diamond, made an offer of proof that the press coverage had been "overwhelming" and "extensive," and his willingness to call reporters to establish the evidentiary basis. The respondent court found it "unnecessary" to do so. Thereafter, Mr. Diamond indicated that "we can assume for purposes of discussion that the press coverage has been extensive, overwhelming and inaccurate."

A recess was declared, and upon resumption, the respondent court indicated *it* had about 12 articles in chronological order, provided by "its staff," which the respondent court thereafter directed to be marked as exhibits, along with one from the other minor's file by reference.

The respondent court then made the statement: "At this juncture I am more concerned with whether or not on the merits of the issue that is presently before me, *given the broadcast and sweeping dissemination of information in the print media,* whether that now justifies my closing the hearing." (Italics added.)

At another point in the hearing, the respondent court merely observed that: "The Valley News is now one of the fastest growing papers in this country. Fastest growing and very important and certainly they are on a collision course with the L.A. Times with regard to who [*sic*] is going to get more readers. [¶] Certainly in the Valley that is true, and it is an open secret that it is owned by the Chicago Tribune, and they are a very aggressive paper, trying desperately to encroach upon the L.A. Times who has a perceived monopoly of newspaper circulation here in the Greater Los Angeles County area. [¶] Now we have this *all-pervasive publicity* being undertaken, specifically by the Daily News with all sorts of articles, . . ." (Italics added.)

At page 54 of the reporter's transcript, the respondent court stated, "I am not willing to characterize [the press coverage] as extreme press distortion," and then again discusses the "unrestricted dissemination of information," as "widely disseminated to a public." Finally, the respondent court issues a tentative ruling to exclude the press because, inter alia, "there is a reasonable probability of prejudice because of the all-pervasive publicity that has been exhibited thus far . . . ."

However, although about 15 newspaper articles were apparently received in evidence, and the contents read into the record and extensively argued, there is *no* evidence as to the *circulation* of the newspapers involved. This court has no way of knowing, or reviewing, whether the *circulation* of any or all of the three papers covers a thousand households, ten thousand, or a million, or, for that matter, the *communities* within Los Angeles County where the circulation occurred. Significantly, there is no evidence in the record of coverage by television or radio nor the metropolitan edition of the Los Angeles Times.

b. *Inadequate notice given.*

A preliminary question is whether *adequate notice* was provided to the press of the hearing on the motion to close the fitness hearing, assuming notice is required.

The record reflects the hearing started out as the fitness hearing scheduled for that date, the time then being 11:38 a.m. After matters relating to the fitness hearing were discussed, Mr. Diamond brought up the question as to whether the fitness hearing should be closed because of the Daily News coverage. The respondent court responded by indicating "[w]e are not going to have a full-blown hearing on whether or not the press should be admitted to this hearing. . . . You should have filed a written motion giving, not only Notice to this Court and the People, but to the media so they could have a representative to represent their own best interests."

Nonetheless, moments later, the respondent court agreed to have a formal hearing on closure *that day at 1:45 p.m.,* and stated to the reporters present in the courtroom from the Daily News and the Los Angeles Times that "the media will have to have their representatives down here at 1:45." That afternoon at 2:30 p.m. the hearing resumed with only Dan Marmalefsky as counsel for the Daily News appearing. Mr. Marmalefsky indicated he first heard of the case at 12:30 p.m. that date but the record reflects he did not

request a continuance. No counsel were present from the Los Angeles Times or the Herald Examiner or any other component of the news media.

Irrespective of the short notice and absence of counsel for the other papers covering the story, the hearing went forward with Mr. Diamond's argument for closure based on the extent and nature of the press coverage, claiming further adverse publicity would prejudice his client and make it impossible for him to get a fair trial with a jury in the jurisdiction.

Obviously, this hearing was not properly noticed to interested parties. Less than two hours notice hardly allows time for the preparation that may be necessary to overcome a prima facie showing of cause for closure. Waiver is not a legitimate argument here because of the lack of notice and the absence of legal representation from the other newspapers involved.

On this record, the press was not provided a fair opportunity to participate.

c. *Brian W. arguments.*

The minor's claim that if he is certified to adult criminal court after his fitness hearing, press attendance at said hearing will result in prejudicial publicity and jeopardize his right to a fair trial is almost identical to the argument made and *rejected* in *Brian W.* v. *Superior Court, supra,* 20 Cal.3d 618. The minor's counsel here maintained that sensitive and detailed information about his family background, his personal history, and damaging statements about his participation in the robberies, will all come out at the fitness hearing. Granted, such evidence may or may not be *admissible* in an adult criminal court, and as argued in *Brian W.,* "thus magnifying the prejudicial effect of dissemination by the press of information obtained at the hearing." (*Id.,* at p. 624.)

However, "[i]n rejecting this argument, the [*Brian W.*] court below found that petitioner [minor] failed to establish a 'reasonable likelihood' that he will be unable to obtain a fair trial." (*Ibid.*) In upholding the lower court's ruling, the Supreme Court in *Brian W.* concluded the finding had "ample support." (*Ibid.*)

The fact of prejudicial publicity and its questionable admissibility in adult criminal court should be but *one factor for a trial court to consider* in ruling on a motion to close a fitness hearing. Certainly prejudicial publicity should not per se be grounds to prevent public access.

### d. *Surnames not confidential.*

The respondent court was also concerned with the news media's use of the minors' surnames. Section 676, subdivision (c), specifically provides: "The name of a minor found to have committed one of the offenses listed in subdivision (a) *shall not be confidential,* unless the court, for good cause, so orders." (Italics added.) The United States Supreme Court has also held that states cannot impose criminal sanctions for the truthful publication on the lawfully obtained name of an alleged juvenile delinquent. (*Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667].)

Here, the minor was accused of robbery while armed, which is one of the offenses listed under section 676, subdivision (a). Further, the media could, and did, ascertain surnames from many sources outside the fitness hearing. Use by the media of a minor's surname should be but a *factor* in the consideration of closure.

### 3. *Potential juror pool large.*

The size of the jury pool in Los Angeles County is an important factor which must be considered prior to closure of a judicial proceeding.[8] The respondent court rhetorically reflected: "The question arises whether or not in L. A. County—and I realize this is a big county. What do you have? 7, 8 million people in this county—whether or not we are going to create such a climate of unholy interest, poisoned by information which has nothing to do with guilt or innocence, but rather information that relates to family dynamics with which a juror should be totally unfamiliar and be uninfluenced by now being exposed to that information is certainly in a position not to say that they are fair and impartial, or at least their statement that they can be fair and impartial is open to some question. [¶] Why should we create the climate to set it up for automatic appeal were we to have an all-pervasive dissemination of inflammatory information? [¶] Why should we create the climate, even arguing for moment we might be able to find somewhere in this county twelve people who haven't heard of this case and had no interest and could give the minor a fair trial? [¶] *Why should the taxpayers underwrite six weeks of sequestration of jurors at a cost of ten thousand dollars a day to select a fair and impartial jury?*" (Italics added.)

---

[8]Pursuant to Evidence Code section 452, subdivisions (g) and (h), we take the judicial notice that Los Angeles County covers 4,083 square miles and had a population of 7,867,181 as of January 1985. (Information supplied by Los Angeles County Department of Planning.) The potential jury pool consists of the total voting age population. The 1980 census found 5,446,115 persons over 18 in Los Angeles County. (Information supplied by Jury Services Division of Los Angeles County Superior Court.)

There is absolutely nothing in the record to support the observations of the respondent court.

The Tribune's counsel, Mr. Marmalefsky, argued it was the minor's burden to show he could *not* find 12 jurors in Los Angeles County who could fairly try the case. He stated to his knowledge, there was no publicity in the Los Angeles Times. The respondent court responded there was some, but did not indicate the Los Angeles Times' articles appeared only in the valley edition, as the record discloses.

The considerations for closure are not unlike those for change of venue, namely, a contention that widespread and prejudicial publicity precludes a defendant from receiving a fair trial in the county where the crimes were committed. In *Odle* v. *Superior Court, supra,* 32 Cal.3d at pages 935-936, the Supreme Court denied a petition for writ of mandate seeking a change of venue for a defendant who was charged with the murders of a police officer and a young woman in Contra Costa County, which crimes received extensive media coverage.

The *Odle* court stated "each case must be decided on its own facts . . . we examine the record and attempt to isolate the *factors* which should affect our determination." (*Id.,* at p. 938, italics added.) The court considered the size of the community, the nature and extent of publicity, the status of the accused and the victims, and the nature and gravity of the offense.

On the extent of the publicity, there was specific evidence as to circulation figures—the approximate circulation, the area covered, and the days of the week circulated, i.e., "a countywide newspaper with circulation of approximately 100,000 (6 days a week)." (*Id.,* at p. 939, fn. 5.) The *Odle* court made the observation: "The size of Contra Costa County and the fact that the publicity was not pervasive in a geographic sense is an important factor in this case." (*Id.,* at p. 942.) The court was using the "reasonable likelihood that a fair trial could not be had in the absence of a change of venue" standard. (*Id.,* at p. 946.)

The *Odle* majority makes *no mention of cost as a factor.* However in the dissent, Justice Mosk recognizes "the considerable burden on the administration of justice and the cost to the public resulting from the change of venue in a major case." Justice Mosk goes on to point out a possible alternative: "import a jury venire from outside the county." (*Id.,* at p. 958.)

Inflammatory news coverage in a newspaper of limited circulation is not sufficient for closure. In *People* v. *Jacobson* (1965) 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], cert. den. 384 U.S. 1015 [16 L.Ed.2d 1036,

86 S.Ct. 1954], morning and evening editions of a Long Beach newspaper had carried front page stories featuring defendant's own incriminating statements as well as a picture of defendant in a comical pose. Although the jury voir dire was lengthened because persons influenced by the press coverage had to be excused, a jury was eventually selected which included no one who could remember reading of the crime. Several persons on the jury panel stated that they did not read the newspaper in question at any time. (*Id.*, at p. 325.)

Here, most of the publicity was apparently limited to the San Fernando Valley. It is highly probable that a large jury pool exists in Los Angeles County which never read the news coverage in the Daily News or the valley edition of the Los Angeles Times. Admittedly, some articles appeared in the Herald Examiner, but again, there was no evidence as to the circulation of the paper on the approximate eight days from the end of May to June 25, 1985, that stories ran, as disclosed by the record.

The argument of potentially tainted jurors and inability to get an impartial jury was also raised and rejected in *Brian W.* The Supreme Court stated therein: "Finally, petitioner overestimates the impact that even substantial publicity might have on the very large pool of potential jurors. Proceedings in this case are being held in Los Angeles County, which has a population of more than 7 million persons; the large number of people available for jury service, when coupled with appropriate safeguards in the conduct of judicial proceedings, makes it highly probable that an impartial jury can be impanelled. (See, e.g., *People* v. *Manson* (1976) 61 Cal.App.3d 102, 173-192 [132 Cal.Rptr. 265].) [¶] The court can further lessen the impact of adverse publicity, if it occurs, by utilizing one or more of a panoply of measures available to protect the defendant and ensure the constitutionality and fairness of proceedings against him. Such measures include granting a change of venue, postponing trial until the effect of pretrial publicity subsides, conducting a searching voir dire, giving clear and emphatic instructions to the jury, and sequestering its members. [Citations.] Postponement and change of venue are not entirely satisfactory remedies, of course, as they may indirectly affect the defendant's right to a speedy trial in the district in which the crime was committed." (*Brian W.* v. *Superior Court, supra,* 20 Cal.3d at p. 625, fn. omitted.)

There was no evidence in this record that *any* of the alternatives to a trial in the *San Fernando Valley,* as suggested by *Brian W.,* were considered. The Los Angeles County Superior Court has numerous branches, excluding San Fernando Valley, within close proximity of the valley courts. The trial could be transferred locally to another branch of the Los Angeles County Superior Court system. There may also be the possibility of untainted po-

tential jurors being bused *into* the San Fernando Valley from other areas of Los Angeles County, but that avenue was not explored either. (*Odle* v. *Superior Court, supra,* 32 Cal.3d at p. 958 (dis. opn. of Mosk, J.).) Another possibility is the sound exercise of the court's discretion to exclude the public from those portions of the hearing involving exceptionally sensitive material such as the probation officer's behavioral study.

4. *Cost factor not controlling.*

It would be a dangerous and totally unacceptable precedent to hold that alternatives to a jury trial within an area where prejudicial publicity has circulated need not be pursued before the press is excluded, based on a *cost factor*.

In dictum, the California Supreme Court made the following statement: "Changes of venue or continuances may subject the parties and courts to considerable inconvenience or expense . . . ." (*San Jose Mercury-News* v. *Municipal Court* (1982) 30 Cal.3d 498, 513 [179 Cal.Rptr. 772, 638 P.2d 655].) Expense to those parties and courts was *not* a discussed factor, much less a deciding one in *San Jose Mercury-News,* nor in *Odle.*

It would seem the complete lack of case authority on point is due to the fact that when balancing the interest of minimizing the expense in the impaneling of an impartial jury against the interests of preserving rights of public access and a free press, it is quite apparent there it is no contest. To conclude otherwise is untenable. There may come the egregious fact situation that calls for a discussion of balancing costs as a serious factor, but this case does not rise to that posture.

Many cases involving sensational, bizarre, lurid and offensive fact situations, which have received extensive television, radio and press coverage in a broad area, have been tried to a jury of 12 impartial persons. (See, e.g., *People* v. *Sirhan* (1972) 7 Cal.3d 710, 728-733 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den. 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 181-192 [132 Cal.Rptr. 265], cert. den. 430 U.S. 986 [52 L.Ed.2d 382, 97 S.Ct. 1686].)

Media dissemination of the alleged facts of horrifying and threatening criminal activity, particularly multiple murders, unfortunately is a fact of life in our society. The news reports may, and do, contain inadmissible hearsay, rank and unfounded opinions, incriminating statements, inaccurate sketches and more. But our criminal justice system is deemed to be hearty enough to withstand prejudicial publicity and still guarantee a given *defendant the most basic right to receive a fair trial.* In this regard, the cost to the

criminal justice system to provide a fair trial is the price we pay for an open society, and a free press with access to criminal proceedings.

5. *All alternatives must be considered prior to a closure order.*

Admittedly, the respondent court was sailing uncharted waters in trying to fashion a test for closure. However, it had some guidance from section 676, which had been amended since *Brian W.* was decided in 1978, expressing the clear intent of the Legislature favoring openness as the rule, not the exception.

That *a hearing* should take place on this issue is rather basic, and a hearing requires *notice. Press-Enterprise Co.* places the *burden* on the defendant to establish a "clear and present danger of prejudice," which may be overcome by a preponderance of the evidence. (*Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d at p. 782.) In *Brian W.,* petitioner also had the burden. (*Brian W.* v. *Superior Court, supra,* 20 Cal.3d at p. 624.)

The test the respondent court was contemplating, "a reasonable probability of prejudice," is a somewhat lesser standard than "a reasonable likelihood of substantial prejudice" or "a substantial probability of prejudice." However, as previously noted, in the final analysis the ruling must be a *"matter of judgment based upon the probabilities."* (*Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d at p. 782 (conc. opn. of Grodin, J.).) To be upheld as a sound exercise of discretion, a court's decision must be based on a consideration of all *relevant factors,* measured against the appropriate standard.

This record is lacking in several particulars. The hearing went forward with inadequate notice to interested parties. The respondent court closed the hearing due to potential prejudice without any evidentiary basis as to the area and amount of circulation of the newspapers in which the articles appeared. Assuming an unresolvably tainted, or potentially tainted local juror pool, no alternative measures were considered.

The reasons expressed by the respondent court for granting the minor's motion for closure, assuming they were valid in and of themselves, were still not adequate to be controlling, but only amounted to *factors* to be considered along with others. One such factor to be given substantial weight is the fitness hearing itself, because of the point in time at which it occurs, and the crucial and sensitive nature of potential testimony.

Prejudicial publicity does not per se necessitate an order barring public access to judicial proceedings, given the size of the potential jury pool in

Los Angeles County. However, irresponsible media by their actions may well forfeit the right of access in flagrant fact situations.

Before ordering closure, the respondent court should consider: (1) the nature and extent of the media coverage, including circulation figures and geographical distribution; (2) possible transfer to a branch of the Los Angeles Superior Court outside San Fernando Valley; (3) feasibility of transporting jurors from another area of the county to the San Fernando Valley court; (4) a change of venue; (5) protection afforded by a searching voir dire of potential jurors; and (6) sequestration of the jury panel. Alternative measures may present difficulties for trial courts but none are beyond the realm of the manageable.

Based on the record before us, it has not been shown publicity would distort the views of potential jurors so that 12 jurors could not be found in Los Angeles County who would fulfill their duty to render a just verdict based solely on the evidence presented in open court. (See *Nebraska Press Assn.* v. *Stuart, supra,* 427 U.S. 539.)

Because this record is so incomplete and inadequate, it does not form a solid basis to support the respondent court's closing the fitness hearing, and therefore, the ruling constituted an abuse of discretion.

### DISPOSITION

The matter is remanded with instructions to conduct a hearing, duly noticed, for consideration of *all* relevant factors to be weighed in a determination of whether the minor has met his burden of establishing that the adverse publicity has created a reasonable likelihood of substantial prejudice to his right to a fair and impartial trial, and to provide the public and press an opportunity to overcome the minor's showing by a preponderance of the evidence that there is no reasonable likelihood of substantial prejudice.

The alternative writ of mandate is discharged and the temporary stay order is dissolved.

Danielson, J., concurred.

**LUI, J.**—I dissent.

I do not agree with the majority's conclusion that the juvenile court abused its discretion in closing the minors' fitness hearings to the public and press.

*The Juvenile's Constitutional Right to a Fair Trial Is Superior to the Press and Public's Statutory Right of Access to a Juvenile Fitness Hearing*

I differ with the majority as to the showing that the minor must make to sustain a closure motion. The appellate decisions have always balanced the defendant or juvenile's right to a fair trial over the press and public's right of access to pretrial criminal proceedings.

In *San Jose Mercury-News* v. *Municipal Court* (1982) 30 Cal.3d 498 [179 Cal.Rptr. 772, 638 P.2d 655], our Supreme Court had occasion to interpret former Penal Code section 868, which then provided, "The magistrate must also, upon the request of the defendant, exclude from the examination every person except" court staff, counsel of record, the Attorney General, investigating officer, the defendant, and a friend providing moral support to a prosecuting witness.

The court in *San Jose Mercury-News* rejected the newspaper's claim that the statute was unconstitutional, reasoning that the federal and state Constitutions give the *press and public a right of access to preliminary hearings that may be foreclosed only when outweighed by a defendant's interest in a fair trial.* Our Supreme Court also rejected the newspaper and amici's argument based on *Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368 [61 L.Ed.2d 608, 99 S.Ct. 2898] and *Richmond Newspapers, Inc.* v. *Virginia* (1980) 448 U.S. 555 [65 L.Ed.2d 973, 100 S.Ct. 2814], which urged that those cases demonstrate that a majority of the United States Supreme Court justices now recognize a *constitutional right* of public and press access to pretrial criminal proceedings such as a preliminary hearing. Addressing the newspaper's contention concerning the purported views of the majority of the United States Supreme Court justices, the court noted: "We extract from this welter of views no consensus that there is a right to attend preliminary hearings. Only five of the *Gannett* court were willing to recognize access rights even to suppression hearings. Four of those (the Blackmun-Sixth Amendment group) expressly distinguished preliminary hearings. The fifth, Justice Powell, also pointed to the unique public importance of the suppression hearing, implying perhaps that he deemed other pretrial matters properly secret." (*San Jose Mercury-News, supra,* 30 Cal.3d at p. 506.)

In 1982, section 868 of the Penal Code was amended; the language providing the defendant with an absolute right to closure was deleted, and language establishing a right of public access to preliminary hearing was added. The amended section 868 now reads: "The examination shall be open and public. However, upon the request of the defendant and a finding by the magistrate that exclusion of the public is *necessary* in order to protect the defendant's right to a fair and impartial trial, the magistrate shall ex-

clude from the examination [all but certain enumerated officials, defendant and his counsel, and the prosecuting witness and a friend]. . . ." (Italics added.)

The 1982 amendments to Penal Code section 868 were considered in *Press-Enterprise Co.* v. *Superior Court* (1984) 37 Cal.3d 772 [209 Cal.Rptr. 360, 691 P.2d 1026]. Our Supreme Court was faced with deciding the standard upon which preliminary hearings could be closed and the showing necessary to justify such closure. The petitioner in *Press-Enterprise Co.* urged that recent decisions by the United States Supreme Court[1] require repudiation of the conclusion reached in *San Jose Mercury-News, supra,* that the First Amendment does not provide the right of access to preliminary hearings.

Our Supreme Court in *Press-Enterprise Co., supra,* 37 Cal.3d at page 776, concluded that: "Neither case warrants repudiation of the conclusion in *San Jose Mercury-News* that *the First Amendment does not provide a right of access to preliminary hearings.* Both cases were concerned with the right of access to trials rather than preliminary hearings. The problem of potential prejudice to the defendant is substantially different in relation to public trials than it is in relation to public preliminary hearings. In *Press Enterprise Company* the [United States Supreme] [C]ourt emphasized that prejudice to the defendant remains the primary concern, stating: '*No right ranks higher than the right of the accused to a fair trial.*' (464 U.S. at p. 508 [78 L.Ed.2d at p. 637, 104 S.Ct. at p. 823].)" (Italics added.)

Our Supreme Court then stated: "Because the preliminary hearing takes place at an early stage in the criminal prosecution, it may be difficult or impossible for the defendant to make a showing of the prejudice which will occur from publicity. At an early stage, the community reaction and the media attitude may not be clear, and the defendant may have little knowledge of the prosecution's strategy and evidence. 'Finally, certain alternate means of preventing prejudice from adverse pretrial publicity, such as gag orders or restraints on publication, can involve equal and even greater intrusions on speech and press rights. (See, e.g., *Nebraska Press Assn.* [v. *Stuart* (1976)] 427 U.S. 539, 556-560 [49 L.Ed.2d 683, 695-698]; *Brian W., supra,* 20 Cal.3d 618, 624, fn. 7.) *Changes of venue or continuances may subject the parties and courts to considerable inconvenience or expense and may even violate the defendant's right to speedy trial in the vicinage.*

---

[1]Petitioner relied on *Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596 [73 L.Ed.2d 248, 102 S.Ct. 2613] and *Press-Enterprise Co.* v. *Superior Court* (1984) 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819], where the court held that an order closing voir dire proceedings was invalid on grounds that the trial judge had failed to consider alternative measures.

(U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 15; *Brian W., supra,* 20 Cal.3d at p. 625.)' (*San Jose Mercury-News* v. *Municipal Court, supra,* 30 Cal.3d at pp. 511-513.)

*"We reject the view that a magistrate in ruling on a request to close the preliminary examination must find that in fact an open preliminary hearing will result in a denial of fair trial. At the time that the magistrate makes the finding predictions must be made as to the amount and nature of publicity which will result from an open preliminary hearing and as to the impact of the anticipated publicity. . . .*

"........................

"[W]e conclude that the magistrate shall close the preliminary hearing upon finding a reasonable likelihood of substantial prejudice which would impinge upon the right to a fair trial. *Penal Code section 868 makes clear that the primary right is the right to a fair trial and that the public's right of access must give way when there is conflict."* (*Press-Enterprise Co., supra,* 37 Cal.3d at pp. 780-781, italics added.)

"Once a defendant establishes a reasonable likelihood of substantial prejudice, there is a clear and present danger of prejudice, and the prosecution or media may overcome the defendant's showing by a preponderance of the evidence to the effect that there is no reasonable likelihood of prejudice. But if the showing in opposition fails to overcome the defendant's showing that there is a reasonable likelihood of substantial prejudice, *it would be improper for the magistrate to jeopardize the fair trial right by permitting a public preliminary hearing. The primacy of the right to fair trial, viewed in the light of the policy consideration in favor of closure set forth above, requires us to conclude that a defendant who has established a reasonable likelihood of substantial prejudice after all of the evidence is considered may not be compelled to risk his fair trial right by an open hearing."* (37 Cal.3d at p. 782.)

Our Supreme Court's holding in *Press-Enterprise Co., supra,* is premised on the defendant's Sixth Amendment right to a fair trial and the lack of a constitutional right of public or press access to a preliminary hearing. Once the defendant makes the requisite showing of necessity for a closed hearing, the statutory right of access of the public and press under Penal Code section 868 must give way. Under *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], this court is bound by our Supreme Court's decision in *Press-Enterprise Co.*

It is crucial to note that closure in *Press-Enterprise Co.* was urged by the defendant and not the People. A different question and analysis would be required if the prosecutor seek closure over a defendant's objections.[2]

The standards set forth by our Supreme Court in *Press-Enterprise Co.* are applicable to juvenile fitness hearings. The juvenile court may close such proceedings at the request of the minor if the court properly determines that there is a "reasonable likelihood of substantial prejudice" to the minor if the fitness hearing is open to the public and press. The juvenile court need not find that an open fitness hearing will result in the denial of a fair trial. The juvenile court should consider the nature and magnitude of media coverage of the juvenile proceedings prior to the fitness hearing, whether the coverage of the case has been excessive or sensational, whether the minor's name had been released to the public, whether there are alternative measures to closure, and whether the proceedings closed to the public and press will be temporary. If the press is able to rebut the minor's showing of prejudice, the fitness hearing shall be open; otherwise, the hearing shall be closed pending further order of the court.

Since the juvenile has a constitutional right to a fair trial under the Sixth Amendment of the United States Constitution and article I, section 16 of the California Constitution and the press and public have only a statutory right of access under section 676, I would not, as the majority does, place as great a burden on the juveniles to sustain a closure of fitness hearings.

The standard for closure laid out by the majority opinion outlines a theoretical framework but pragmatically impossible standard to gain closure because the majority's standard is anchored by its ultimate position that a large jury pool in a county such as Los Angeles eliminates any possible showing of prejudice.

In my view, *Press-Enterprise Co., supra,* 37 Cal.3d 772, and the other cases cited above, stand for the proposition that the primary interest of the trial court must be to protect a juvenile or defendant's constitutional right to a fair trial; the public's right of access must give way when there is a conflict with this constitutional right. That conflict was presented to the court below and the court acted properly in closing the fitness hearing based on the showing made by the parties.

---

[2]Justice Blackmun's dissent in *Gannett Co.* v. *DePasquale, supra,* 443 U.S. 368, 411 [61 L.Ed.2d 608, 641, 99 S.Ct. 2898], states that the United States Supreme Court has yet to rule on "whether and to what extent the Constitution prohibits the States from excluding, at the request of a defendant, members of the public from such a [pretrial suppression] hearing." I have found no subsequent United States Supreme Court decision which has ruled on the question.

The juvenile court is charged with the responsibility of insuring that a minor has a fair and speedy trial. The Juvenile Court Law mandates the expeditious handling of juvenile petitions and fitness hearings. A fitness hearing must be held within 13 judicial days from the date of the order directing detention of a minor in custody (see Cal. Rules of Court, rule 1346(a)); and a detention hearing must be conducted within 48 hours of the minors' arrest (see § 631 and rule 1321). Any delay in the holding of a fitness hearing has an impact on a minor's right to a speedy trial. Therefore, the lack of a more lengthy notice of the motion to the media was not unreasonable.

*A Fitness Hearing Is Conducted at the Equivalent Stage of a Preliminary Hearing in an Adult Criminal Matter*

The 18 violent offenses enumerated in section 676 involve matters that would be felonies in the adult court. In my view, a preliminary hearing is conducted at the functionally equivalent stage of a fitness hearing in a juvenile delinquency matter.

The purpose of the preliminary hearing in California is to determine whether there is sufficient evidence presented to a magistrate to support binding the defendant over to trial in the superior court.

The purpose of the fitness hearing is to determine whether the minor is a fit and proper subject for juvenile court jurisdiction or whether the minor should be bound over to the adult court for criminal prosecution. If the minor is determined to be a fit and proper subject for juvenile court adjudication, the next phase will be a trial in the juvenile court.

If the minor is determined not to be fit and proper subject for juvenile court jurisdiction, the district attorney is authorized under section 707.1 to file an accusatory pleading against the minor in the adult criminal court. After arraignment in the municipal or justice court, the matter proceeds to a preliminary hearing and the standards set forth in *Press-Enterprise Co.* v. *Superior Court, supra,* 37 Cal.3d 772, apply regarding closing the preliminary hearing to the public and press.

It would be illogical to rule that a fitness hearing is open under a different standard than a preliminary hearing, the minor found unfit, and then sent to the adult court for a preliminary hearing which is then closed under a different standard than that set forth by our Supreme Court in *Press-Enterprise Co., supra.*

During the course of the preliminary hearing, it is common for the defense to make suppression motions seeking to exclude evidence seized by the

police or statements and confessions made by the defendant. The magistrate must consider the necessity of closing the preliminary hearing in order to prevent prejudicial pretrial publicity from damaging the defendant's right to a fair trial.

Similarly, during the course of a fitness hearing conducted on a petition alleging one of the 18 violent offenses, the minor is entitled to have the prosecution prove a prima facie case that the minor committed the offenses before the presumption of unfitness is applied. (See *Edsel P.* v. *Superior Court* (1985) 165 Cal.App.3d 763, 779 [271 Cal.Rptr. 869].) During the prima facie hearing, the minor may object and seek to exclude evidence offered by the prosecution on grounds that it was obtained in violation of the minor's constitutional rights. (Cf. *Edsel P., supra,* 165 Cal.App.3d at p. 780, fn. 10.)

In our Supreme Court's recent decision of *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802, 806-807 [210 Cal.Rptr. 204, 693 P.2d 789], the court stated: " 'The minor who is subject to the possibility of a transfer order [a finding of unfitness] should not be put to the unfair choice of being considered uncooperative by the juvenile probation officer and juvenile court because of his refusal to discuss his case with the probation officer, or of having his statements to that officer used against him in subsequent criminal proceedings.' [Citation.] 'The testimony of the juvenile may be relevant in the application of any of [the section 707(c)] criteria. As to the juvenile's criminal sophistication, his chances of rehabilitation, his past delinquent history and the success of previous attempts to rehabilitate him, the juvenile may be able to rebut the implications of a bare record by cross-examination of the probation officer and testimony of his own witnesses. Significant evidence may well exist only in the knowledge of the juvenile. As to the circumstances and gravity of the offenses alleged, the juvenile may be the only witness who can present any mitigating circumstances for the court to consider. Yet such testimony risks giving the prosecutor the advantage of an admission which could be used against the juvenile at the trial on the issue of guilt.' (*Sheila O.* v. *Superior Court* (1981) 125 Cal.App.3d 812, 815 . . . .)' "

The holding of *Ramona R.* that a minor's testimony at a fitness hearing is inadmissible at a subsequent trial, underscores the need to allow the juvenile court discretion to close a fitness hearing upon the proper showing. If the minor desires to fully discuss his involvement in order to demonstrate his amenability to juvenile rehabilitation but is nevertheless found unfit in an open and public hearing, extensive media coverage may well impinge on the minor's ability to obtain a fair jury trial in the adult court.

*The Record Supports a Finding of Reasonable Likelihood of Prejudice Which Petitioner Failed to Rebut*

The only position submitted by the petitioner at the hearing was that Welfare and Institutions Code section 676[3] now gives the public and press a broad right to attend juvenile proceedings involving the 18 violent offenses, and that the minors bore the burden of showing that it could not obtain 12 impartial jurors in Los Angeles County.

The majority concedes that neither the petitioner nor the representatives from the Los Angeles Times (Times) or Herald Examiner (Herald) requested a continuance or objected to the brevity or adequacy of the notice of the closure motion. Despite the lack of any objection or conclusion, the majority concludes that the petitioner did not waive the lack of notice or the adequacy thereof. The majority's position is contrary to clear appellate precedent which holds that a waiver of the adequacy of any notice of a pending motion occurs when a party appears and fails to object to a proceeding conducted pursuant to the motion. (See *Wilson* v. *Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 561 [194 Cal.Rptr. 773, 669 P.2d 9].)

Additionally, the majority somehow finds that the Times and Herald representatives did not waive the absence of their legal counsel at this hearing. They are not even parties to this petition. In addition, the record is clear and reflects that neither the reporters from the Times or Herald objected to, or sought a continuance to obtain counsel, or even expressed a desire to have counsel present at this hearing.

It is also noteworthy that the respondent court was presented with the minors' motions to close the proceedings to the public and press during the detention hearings conducted on June 4 and 10, 1985. The juvenile court rejected these motions on these two dates. The media representatives should not have been surprised by the minors' renewed attempt to gain closure on June 24, 1985.

Based upon the lack of any objection by the petitioner or Times' and Herald's representatives, the position that the press was not provided a fair opportunity to participate in the hearing is untenable.

The majority emphasizes that the record below lacks any showing of the circulation of the newspapers in question. It cannot be seriously denied that the Times, Herald and Daily News represent three of the largest newspapers

---

[3]Hereinafter, all statutory references shall be to the Welfare and Institutions Code unless otherwise indicated.

of general circulation in the Los Angeles metropolitan area. One must look only to the front page of the Times to determine its daily and Sunday circulation statistics.

What the majority fails to recognize is that the minors asserted that the press coverage had been overwhelming and extensive. The minors presented a number of newspaper articles from each of the three newspapers in question. None of the media representatives present, except Mr. Marmalefsky, challenged the position of the minors that the media coverage was extensive. The record demonstrates that Mr. Marmalefsky was obviously incorrect in stating that there was no publicity of the case in the Times. It is not significant that the minors failed to present circulation statistics to the court once they presented the court with the articles from each of the three widely circulated newspapers.

At the June 24, 1985, hearing, the minors presented numerous newspaper articles which appeared in the Daily News and the Herald which are both widely circulated outside the San Fernando Valley and in the remaining parts of the greater metropolitan Los Angeles area. The minors also presented clippings from the Times which appeared both in the *valley* edition and the metro edition section of the Times. (See exhibits C and D to the petition filed by minor Michael M.)

The majority completely ignores the inescapable conclusion that the metro edition is widely disseminated in the metropolitan Los Angeles area outside of the San Fernando Valley—a matter which could have been easily refuted by the Times' representatives who stood mute during the course of the hearing in question. There is simply no basis in the record for the majority's conclusion that the publicity was *apparently* limited to the San Fernando Valley.

Michael's counsel contended that the newspaper articles were prejudicial to Michael's interest, were erroneous, and contained irrelevant and inadmissible matters; he called the court's attention to certain newspaper reports. The court noted particularly the June 23, 1985, article from the Daily News which began on the front page of part I, and reported an interview the investigating officer, Detective Pikor, had with one of the minors as follows: "Pikor said that in an interview 'the little one' talked about the excitement involved in the holdups, about 'how it was funny to see the expressions on people's faces when you point a gun at them.' "[4]

---

[4]The minors had urged the court to cite the officer for contempt for failing to comply with a previously imposed "gag" order.

The petitioner failed to make any attempt to rebut the showing of potential prejudice made by the minors. In particular, the petitioner failed to rebut or even address the potential prejudicial impact of the articles reporting the minor's admission of involvement to an investigating officer.

The fact that there is a large jury pool in Los Angeles County is not a "catch-all" solution to counter prejudicial pretrial publicity. As the trial court noted, the public should not be required to pay for the costs of the media's lack of discretion in reporting on potentially inadmissible evidence which could therefore require a more protracted and complex jury selection during trial. Any delay would infringe on the accused minors' right to a speedy trial and would have, in all probability, increased the parents' financial burden of defending the charges at trial.

Any closure would be temporary at best. If the minor Michael is found fit, the trial in the juvenile court would proceed almost immediately and be open to the press and public in the same manner as an adult criminal trial.[5]

If the minor Michael is found unfit, further criminal proceedings would be open, subject to the closure of the preliminary hearing by the magistrate upon a showing of necessity—such necessity may well have dissipated after the holding of the fitness hearing. Thereafter, the remaining proceedings in the adult court would be open.

Further, section 827, subdivision (b)(1)[6] retains the right of confidentiality in juvenile court records, including the juvenile proceedings in which the minor is charged with a violent offense. (See §§ 676 and 707, subd. (d).) Such records would include documents and reports filed by a probation officer and psychiatric or psychological reports ordered by the juvenile court. The language in section 827, subdivision (b)(1), adds support to the proposition that the Legislature was cognizant of the need to control the

---

[5]The United States Supreme Court has refrained from defining the circumstances in which all or a part of a criminal trial may be closed to the public. (See *Richmond Newspapers, Inc.* v. *Virginia, supra,* 448 U.S. 555, 581, fn. 18 [65 L.Ed.2d 973, 992, 100 S.Ct. 2814].) There is no absolute right to an open trial; the closure of such proceedings " 'must be rare and only for cause shown that outweighs the value of openness. [Fn. omitted.]' " (See *Press-Enterprise Co.* v. *Superior Court* (1984) 464 U.S. 501, 509 [78 L.Ed.2d 629, 638, 104 S.Ct. 819].)

[6]Section 827, subdivision (b)(1), provides: "While the Legislature reaffirms its belief that juvenile court records, in general, should be confidential, it is the intent of the Legislature in enacting this subdivision to provide for a limited exception to juvenile court record confidentiality in cases involving serious acts of violence. Further, *it is the intent of the Legislature that even in these selected cases dissemination of juvenile court records be as limited as possible* consistent with the need to work with a student in an appropriate fashion, and the need to protect potentially vulnerable school staff and other students over whom school staff exercise direct supervision and responsibility." (Italics added.)

public dissemination of information contained in juvenile delinquency records when it amended section 676 because section 827 limits dissemination of such records even as to cases involving a violent offense.[7]

I do not quarrel with the clear legislative mandate that juvenile hearings involving the 18 enumerated violent offenses are now open under section 676. However, the fact that these juvenile hearings are now open does not mean that they should not be closed upon a proper showing to protect the juvenile's constitutional right to a fair trial.

The finding made by the respondent court was not couched in the exact language stated in *Press-Enterprise Co., supra.* Nevertheless, given the facts and circumstances of this case, the finding is the substantial equivalent to that required by *Press-Enterprise Co.*

The respondent court considered the extent and nature of the considerable publicity in the media concerning these juvenile cases. These articles, unlike those in *Brian W., supra,* 20 Cal.3d 618, are of the type that seeks to appeal to the public's thirst for sensationalism. Some of the articles deal extensively with one of the minors' parent's criminal record, the minors' mental and psychological condition before and after the alleged offenses, and characterized the minors as part of or members of juvenile gangs known as "rat packs." The articles also made extensive use of the minors' surnames.[8]

There had been no opportunity, prior to the fitness hearing, for either minor to challenge and rebut the statutory presumption of unfitness that applies because each was a minor over 16 years of age and charged with armed robbery. (See § 707, subd. (b); and *Edsel P.* v. *Superior Court, supra,* 165 Cal.App.3d 763, 776-777.) The minors may have at, or prior to the fitness hearing, been successful in suppressing evidence seized by or statements made to police officers, including admissions or confessions to such offenses.

The Daily News article of June 23, 1985, was critically prejudicial since it reported one of the minor's admissions to a police officer. As the majority opinion in *Gannett Co.* v. *DePasquale, supra,* 443 U.S. 368, 378-379 [61

---

[7]An attempt was made to amend section 827, subdivision (b)(1), at the time section 676 was amended to add the language regarding opening juvenile records involving one of the violent offenses, in the same manner such records were opened in adult proceedings. This attempt, however, was defeated. (Compare Assem. Bill No. 1374 (1979-1980 Reg. Sess.) as originally introduced on Mar. 27, 1979, with the bill as amended in the Assem. on Jan. 8, 1980.)

[8]There probably was no opportunity for either minor to prevent release of the minors' surnames based on a showing of good cause. (See § 676, subd. (c).)

L.Ed.2d 608, 620-621, 99 S.Ct. 2898], states: "This court has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial. [Citations.] *To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. [Citation.] And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.*

"Publicity concerning pretrial suppression hearings such as the one involved in the present case poses special risks of unfairness. *The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury.* [Citations.] Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.

"The danger of publicity concerning pretrial suppression hearings is particularly acute, because it may be difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial. After the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means. [Fn. omitted.] *When such information is publicized during a pretrial proceeding, however, it may never be altogether kept from potential jurors. Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such information throughout the community before the trial itself has even begun.* [Citation.]" (*Gannett Co., supra,* at pp. 378-379; italics added.)

The newspaper report of the minor's admission and the extensive media coverage occurred at a time prior to any judicial determination as to whether the admission was even admissible at trial.

*The Majority's Reliance on Brian W. Is Misplaced*

The decision in *Brian W., supra,* holding that the juvenile court abused its discretion in admitting the press under former section 676 is premised on the lack of excessive or sensational reporting on that case *and* the presence of a large jury pool in Los Angeles County.

Brian contended that if he was certified to adult criminal court after his fitness hearing, press attendance at the fitness hearing will yield prejudicial publicity and jeopardize his right to a fair trial. The court stated: "In re-

jecting this argument, the court below found that petitioner failed to establish a 'reasonable likelihood' that he will be unable to obtain a fair trial. This finding has ample support. [Fn. omitted.] After reviewing copies of the newspaper articles which deal with petitioner—without naming him—and the crime with which he is charged, we conclude that media coverage in this case has been neither excessive nor sensational; rather, the media appear to have reported responsibly about a matter of legitimate public interest. [Fn. omitted.] Nothing in the record suggests that coverage of the fitness hearing, ordinarily an undramatic event, will be any less responsible." (*Brian W.* v. *Superior Court, supra,* 20 Cal.3d at pp. 624-625.)

Our Supreme Court in *Brian W.* took note of the fact that the proceedings would be held in Los Angeles County which had a population of more than 7 million people and that appropriate safeguards could be imposed to make it highly probable that an impartial jury could be impanelled. The court then stated: "We conclude . . . that when past media coverage relating to a case has been neither excessive nor sensational *and* the jury pool in the jurisdiction is large, a court does not err in refusing to bar press representatives from a juvenile fitness hearing. Adequate safeguards are available [such as postponement of trial, change of venue, searching voir dire, clear and emphatic jury instructions and strict control over the jury], should they be necessary, to protect the defendant's rights if he is certified to adult court." (*Id.,* at p. 626; italics added.)

The court's ruling in *Brian W.* is premised on a determination that the juvenile court did not abuse its discretion in admitting the press given the magnitude and nature of the press coverage of that case and the availability of safeguards to insure a fair trial for Brian. (*Id.,* at p. 623.)

Section 676 was amended subsequent to the decision in *Brian W.* The section as amended retains the language dealing with the juvenile court judge or referee's discretionary power to admit persons to juvenile hearings involving lesser offenses who "*may* . . . have a direct and legitimate interest in the particular case or the work of the court." (Italics added.) The Legislature, however, added provisions allowing public access "on the same basis as they may be admitted to trials in a court of criminal jurisdiction, to hearings" involving petitions that allege a minor violated any one of the eighteen violent offenses.

In ruling on the petition presented, an interpretation of the meaning of the added language to section 676 is required. The majority is correct in applying the *Press-Enterprise Co., supra,* standard and holding that a fitness

hearing should be open unless a minor can establish a reasonable likelihood of substantial prejudice to the right to receive a fair and impartial trial.

I would deny the petition and discharge the alternative writ.

A petition for a rehearing was denied October 9, 1985, and the petitions of Tribune Newspapers West, Inc., and Mark B. for review by the Supreme Court were denied January 16, 1986. Bird, C. J., Mosk, J., and Lucas, J., were of the opinion that the petitions should be granted.