Filed 12/23/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>DEREAK H. TURNER,<br><br>        Defendant and Appellant. | A159822<br><br>(Alameda County<br>Super. Ct. No. H58999) |

Defendant Dereak H. Turner appeals a judgment entered upon a jury verdict finding him guilty of second degree murder. He was charged with committing two unrelated murders (the Oakland and Hayward murders), and the cases were consolidated. At the close of evidence in the consolidated trial, he renewed his earlier motion to sever the two charges on the ground the evidence he committed the Oakland murder was weak. The trial court granted the motion, ruling it would leave the jury to decide only the Hayward case. Defendant then unsuccessfully sought a mistrial in the Hayward case on the ground the jury would be influenced improperly by having heard the evidence of the Oakland murder. His sole contention on appeal is that the trial court abused its discretion in denying his motion for a mistrial. We agree with him, reverse the judgment, and remand the matter for a retrial.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Hayward Case

In the Hayward case (count 3 of the consolidated information), defendant was charged with murdering Thomas Cunningham (Pen. Code, § 187, subd. (a)),[1] with allegations that he personally and intentionally discharged a firearm and caused great bodily injury and death (§§ 12022.7, subd. (a), 12022.53, subds. (b) & (d)). Defendant admitted he killed Cunningham but took the position that the circumstances justified a conviction only of voluntary manslaughter.

When the case came to trial almost ten years after the homicide, Cunningham's daughter Chelsie was the prosecution's main witness.[2] Chelsie testified that on the evening of November 24, 2009, when she was 13 years old, her father had a couple of drinks outside his home with Chelsie's sister and her friends. Afterward, Chelsie walked with her father and her two dogs, a Pekinese Chihuahua mix and a German Shepherd, to a corner store to get ice cream. Chelsie waited outside the store with the dogs, and Cunningham went inside to buy the ice cream. Chelsie held the German Shepherd by the collar, without a leash, and the smaller dog walked unleashed.

Cunningham came out of the store, and Chelsie saw a man later identified as defendant approaching them. As Chelsie and her father started walking home, the German Shepherd pulled free from Chelsie and walked up to the man to sniff his leg but did not make physical contact. Chelsie saw the man "stop and freeze," and he might have "put his hand up like he was

---

[1] All statutory references are to the Penal Code.

[2] We will refer to Chelsie and to other witnesses of this crime by their first names, intending no disrespect.

surprised." He asked her to grab the dog, sounding "uncomfortable or nervous or defensive maybe." Chelsie called to the dog, walked up, and grabbed him by the collar. Cunningham, who was a few feet ahead, turned around asked the man, "What?" and began arguing with him from a distance of seven or eight feet. Their exchange was hostile, argumentative, and angry. Chelsie did not recall specifically what they were saying, but she thought they were "cussing." She did not hear her father threaten the man, and the two men did not approach each other or exchange blows. By that point Chelsie had the German Shepherd by the collar, and the dog did not bark or try to pull away from her. Her attention was primarily focused on managing the dogs.

Chelsie saw the other man pull a gun from his waistband, heard a gunshot, and saw her father stumble backward and fall. The man then ran away. Chelsie was later shown a photographic lineup and identified a picture of defendant as looking like the person who shot her father.

Cunningham died of two gunshot wounds. His autopsy showed that he weighed 232 pounds and had a blood alcohol level of .22 percent.

Yvonne G., who lived in the neighborhood, sometimes obtained crack cocaine from defendant and was hoping to do so the evening of the shooting. She was walking to a liquor store that evening and spoke with defendant on the phone as she walked. She heard barking through the phone and was surprised because she knew defendant did not like being around dogs. As she approached within earshot of the store, she heard dogs yapping, then defendant screaming, "like[] they were attacking him," "Get them off of me, . . . I'll put a cap in your ass," and another male voice speaking in a "mannerly" tone, then a little girl's voice saying "Don't let him kick my dog," then "pow pow." Defendant ran past Yvonne and, still hoping to get drugs

3

from him, she told him to go to her house.  In October 2017, Yvonne walked in to the police station to give her statement, apologizing for her years of silence.

A friend of defendant's, Nicole H., testified that defendant called on the night of the crime and asked her to pick him up.  When she did so, he told her that a man's dog jumped on him, the man lunged at him, and he shot the man.

Defendant, who was 20 years old at the time of the killing, testified at trial and admitted shooting Cunningham.  Relevant to his defense, he is African-American and Cunningham was white.  Defendant was smaller than Cunningham, with a height of 5 feet 10 inches and a weight of about 180 pounds.  Defendant testified that he carried a gun regularly because he was robbed and beaten at gunpoint when he was 13 years old.

On the evening of the shooting, defendant had been smoking marijuana with a friend and was "a little high" and in a good mood.  As he walked along the street afterward, a German Shepherd ran up to him and tugged at his pants leg, and he was nervous because he did not know whether the dog was vaccinated or how it normally behaved.  When the dog stood on its legs as if to put its paws on defendant's sweatshirt, defendant "kind of froze" and said, "Whoever dog this is, can you please come get your dog."  Chelsie ran up, grabbed the dog, and apologized, and defendant accepted her apology and told her the dog had made him nervous.  Cunningham came out of the store and said, "What the fuck did you say, nigger?," and defendant told him that he should get a leash for his dog and that it was "not that serious." Defendant testified that he had "never experienced such hatred and racism," and that it seemed Cunningham thought he had disrespected Chelsie.

4

Cunningham threatened to "kick [defendant's] ass" and to kill him, but defendant did not take the threats seriously.

Defendant turned as if to walk away, and he heard Chelsie say, "No. Let's just go." Defendant looked back and saw Cunningham with his left fist balled up, lunging in defendant's direction. Defendant thought he was about to be attacked and he was scared; he did not want to get in a fight with Cunningham, who "had [him] by 40 or 50 pounds," and he was concerned the dog would protect its owner if there were a physical fight. He fired the gun toward Cunningham and ran away.

Afterward, defendant called a friend and told her that "[t]his guy tried to attack me. I was afraid. I did what I had to do." He testified that he did not intend to kill Cunningham and was ashamed when he learned Cunningham had died. When defendant later spoke to the police, he did not tell them what had happened; he was "[a]bsolutely" concerned that he had shot a white man, and he thought the police "just want to arrest someone and see someone in prison, particularly young African-American males."

## II. The Oakland Case

In the Oakland case, defendant was accused of murdering Jamal Waters and dissuading a witness, Dejon Barlow, by force or threat (Pen. Code, §§ 187, subd. (a), 136.1, subd. (c)(1); counts 1 and 2), with various enhancement allegations.

Barlow testified at defendant's preliminary hearing. He was found unavailable to testify at trial, and his preliminary hearing testimony was read to the jury. According to this testimony, Barlow used to hang out with Waters and several other people, including Dachaun Dupree. On March 11, 2008, Barlow bought marijuana from Waters and they went to Dupree's house. Defendant was there as well, and either he and Dupree or only

5

Dupree accused Waters of having taken a gun, then defendant extended his arm and shot Waters in the head with a single shot, killing him. Defendant used a 9-millimeter gun that Barlow had previously seen in his possession. When Barlow was later arrested on an unrelated matter, he provided information to the police about the homicide.

The doctor who performed an autopsy on Waters testified he died of a gunshot wound to the head, which would have caused death within a few minutes.

The jury also heard Barlow's preliminary hearing testimony about a second incident, the basis for the charge of dissuading a witness. In June 2014, when Barlow was in custody at a local jail, defendant and another person came into his cell and "jumped" him. Defendant told Barlow he was "on paperwork"—meaning Barlow had provided information about the killing of Waters—and that Barlow would be killed if he made it to prison. A deputy sheriff testified that Barlow had a swollen eye and blood coming from his nose. After Barlow told the deputy sheriff who had attacked him, the deputy sought and spoke with defendant, and after being treated for his injuries Barlow was moved to a different area of the jail.

In his testimony at trial, defendant denied shooting Waters or being present when he was killed. He acknowledged that he knew Waters and that he and Dupree were friends. He denied knowing anything about a dispute over a missing gun, and he said he did not think Waters would ever steal anything from him. He admitted that he assaulted Barlow in the jail, but he said he did so because he had heard that Barlow had killed Waters and that Barlow was spreading a rumor that defendant was the killer.

## III.    Procedural History

The People moved to consolidate the Hayward and Oakland cases, and the trial court granted the motion on May 18, 2018 over defendant's objection.  Before trial, defendant moved to sever the two murder counts and order separate trials.  The trial court denied that motion.

It appears that, in addition to Barlow being unavailable to testify in person, two of the witnesses the prosecutor had anticipated would testify about the circumstances of the Oakland case were unwilling or unable to do so.  After evidence was complete, defendant renewed his motion to sever.  He argued that the evidence defendant killed Waters was too weak to support a conviction in an independent action, but that the far stronger evidence that he killed Cunningham—in a crime defense counsel described as the more inflammatory of the two—might persuade a jury that he also killed Waters.  Defendant also argued that there was strong evidence the killing of Cunningham was manslaughter rather than murder, but that he would be prejudiced by the jury evaluating his defense "against the backdrop of . . . a weak case where he's being accused of blowing [Waters's] brains out for no apparent reason at all."

The court noted that evidence of the Cunningham killing encompassed approximately 85 percent of the testimony at trial and that "every once in a while, almost like a hiccup during a meal, there is a reference to what happened [in Oakland]."  The trial court granted the motion to sever the cases.  The prosecutor said he would continue the trial with count 3, the killing of Cunningham, and the trial court said it would remove the Waters homicide from the jury's consideration and would instruct the jury with the pattern instruction for removal of a count.

Defendant then moved for a mistrial on the ground that, in considering Cunningham's death, the jury would be influenced by the evidence it had heard of the death of Waters. The trial court denied the motion, concluding the jury would be able to follow its instructions to disregard the evidence of Waters' killing, evidence that it described as de minimis.

Before closing arguments, the trial court instructed the jury it would no longer need to decide counts 1 and 2 and told it to disregard all evidence of these counts and to consider only the evidence of count 3, the killing of Cunningham. The court went on to specify that the jury must disregard in its entirety the medical evidence regarding Waters's death, the testimony of Barlow and the deputy sheriff, and the portions of defendant's testimony that related to the Oakland case. The court asked for a show of hands on whether the jurors understood, then obtained their individual promises to confine their deliberations to the remaining count.

In his closing argument, defendant's counsel contended defendant was guilty of voluntary manslaughter rather than murder under two theories. First, counsel argued, defendant acted under the influence of intense emotion when an intoxicated Cunningham, who thought defendant was behaving offensively toward his daughter, called defendant by a racial epithet and lunged at him. Second, defendant acted in imperfect self-defense, that is, in the actual but unreasonable belief he needed to use deadly force to avoid imminent danger of death or great bodily harm because he was afraid of both Cunningham and the German Shepherd.

Before the jury began deliberating, the trial court again instructed the jury pursuant to CALCRIM No. 205: "Counts 1 and 2 charging the defendant with murder and intimidating a witness no longer need to be decided in this

8

case. Do not speculate about or consider in any way why you no longer need to decide these counts."

The jury found defendant not guilty of first degree murder but guilty of second degree murder, and found true allegations that he personally used a firearm, personally and intentionally discharged a firearm, and personally inflicted great bodily injury. (§§ 187, subd. (a), 12022.7 & subd. (a), 12022.5, subd. (a), 12022.53, subds. (b), (c), (d).) Later, the trial court granted the People's motion to dismiss counts 1 and 2 due to insufficient evidence.

Defendant moved for a new trial, arguing that he suffered incurable prejudice from admission of the evidence relating to the Oakland case. The court denied the motion, noting as it did so that the jurors each said they would disregard the evidence of the Waters homicide and there was no indication they did not do so.

The court sentenced defendant to 15 years to life for second degree murder, with an additional 25 years for a firearm enhancement (§ 12022.53, subd. (d)), for a total term of 40 years to life.

## DISCUSSION

Defendant contends the trial court abused its discretion and deprived him of due process of law when it denied his motion for a mistrial. He reasons that the ruling undermined his defense to the Cunningham homicide that he was guilty of only voluntary manslaughter rather than murder—under a theory of imperfect self-defense or because intense emotion in response to sufficient provocation obscured his reason or judgment. (See *People v. Rios* (2000) 23 Cal.4th 450, 453–454.) And, defendant argues, evidence of the Oakland murder would affect the jury's evaluation of the credibility of his testimony about the encounter with Cunningham, including his testimony that Cunningham used a racial slur, that Cunningham lunged

9

at defendant, and that defendant carried his gun because he had been robbed and beaten in the past.

Defendant's argument is that when the jury heard evidence that he killed Waters, it created a picture of him as a "cold-blooded assassin," an impression that was "allowed to work on the jurors' minds" for a week before the judge told the jury to disregard that evidence. Together with the evidence of defendant's attack on Barlow in jail, this evidence created an image that undermined the credibility of his testimony that he believed he had to use deadly force to protect himself from death or great bodily injury when he shot Cunningham. And, he argues, his defense of manslaughter found substantial support in the evidence suggesting that Cunningham, who had a .22 percent alcohol level, believed a black man might have insulted his daughter, in Chelsie's testimony that the incident involved "cussing," in Cunningham's advantage in size over defendant, in the fact that the dog who approached him was a German Shepherd, a large breed traditionally used as a guard or police dog, and in the evidence that defendant appeared apprehensive when the dog pulled away from Chelsie's control.

The Attorney General begins his argument from a different starting point. He asserts that because the two homicides "were properly joined initially, the jury was properly permitted to hear the evidence of the Oakland case." We doubt the logic of this argument in a trial where the trial court ultimately severed the cases, but we begin by considering black letter law regarding joinder and the standards for granting a mistrial.

Section 954 authorizes two or more offenses "of the same class of crimes or offenses" to be charged together. Our high court considered the standards for joinder and, as most pertinent here, severance of charges in *People v. Simon* (2016) 1 Cal.5th 98, 121–131 (*Simon*). Joinder is normally favored

over separate trials because it promotes judicial efficiency, but a court has discretion to sever charges in the interest of justice and for good cause. (*Id.* at p. 122.) In reviewing the denial of a motion to sever, we consider "whether, in light of the information available at the time, the trial court abused its discretion in denying the severance motion." (*Id.* at p. 122; *People v. Westerfield* (2019) 6 Cal.5th 632, 689.) To prevail on this point, the defendant must make a " 'clear showing of prejudice,' " one that is "stronger . . . than would be necessary to exclude evidence of other crimes in a severed trial." (*Simon*, at pp. 122–123; accord, *People v. Soper* (2009) 45 Cal.4th 759, 774.)

Several factors are relevant to the severance inquiry. First, we ask whether the evidence relating to the different charges would be cross-admissible if the trials were held separately. (*Simon*, *supra*, 1 Cal.5th at p. 123.) Although cross-admissibility may be an "independently sufficient condition justifying a trial court's denial of severance, it is not a necessary one." (*Ibid*; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221–1222.) There is no dispute that the evidence related to two homicides in this case would not have been cross-admissible in separate trials. Other factors are whether any of the charges are unusually inflammatory and whether a weak case has been joined with a strong case or another weak case, factors that reflect a concern that the jury might aggregate evidence or be influenced by a particularly inflammatory crime when the evidence of one offense may be weak. (*Simon*, *supra*, 1 Cal.5th at pp. 123, 127–128.)

Even if the trial court did not abuse its discretion under state law when it denied a motion to sever under the information available at the time, we still reverse if " 'events after the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's

11

constitutional right to fair trial or due process of law,' " that is, "if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon, supra*, 1 Cal.5th at pp. 129–130, quoting *People v. Merriman* (2014) 60 Cal.4th 1, 49; see *Simon*, at p. 123.)

A similar concern animates a motion for mistrial. The court should grant a mistrial " ' "if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 703 (*Edwards*).) When the trial court instructs the jury to disregard improper testimony, we review for abuse of discretion the trial court's reliance on a curative instruction in place of declaring a mistrial. (*People v. Cox* (2003) 30 Cal.4th 916, 953 (*Cox*), overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, & fn. 22; *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 (*Navarrete*).)

The issue before us is not whether the trial court properly denied defendant's motion to sever the counts at the outset of the trial, at a time when it appeared there would be stronger evidence in the Oakland case than ultimately was available. That is an issue we have no occasion to decide because the trial court itself ultimately granted the motion to sever, and only the Hayward case was presented to the jury. In severing the cases, the trial court struck all evidence of the Oakland murder and the related jailhouse beating because that evidence was, in retrospect, all inadmissible in the trial on the Hayward homicide. The People have made no claim that this evidence

was in fact admissible in a severed trial on the Hayward homicide.  Nor have the People drawn our attention to any authority supporting their view that in a severed case we should apply the rules governing joinder of separate counts when analyzing the effect on the jury of hearing inadmissible evidence that defendant committed unrelated crimes.  We see no reason to depart from the usual standards for analyzing the effect of inadmissible evidence when determining whether defendant was entitled to a mistrial.  Under the rules we have discussed, the appropriateness of a mistrial depends on the likely effect on the jury of the mistakenly admitted evidence.  (See *Edwards*, *supra*, 57 Cal.4th at p. 703.)  *Why* the evidence of the Oakland murder was mistakenly admitted in defendant's trial on the Hayward homicide is irrelevant to this inquiry.

In denying the mistrial motion, the trial court explained that it would instruct the jury to disregard the evidence of the Oakland case and that there was "absolutely nothing that makes me think that this group of 12 people is going to be incapable of following the instructions that I give, even in this situation."  The court told the jury that it should disregard all evidence in the Oakland case and specified the pertinent evidence, and it obtained a show of hands and the assurance of each juror that they would do so.

It has long been the rule that a reviewing court presumes the jury follows an instruction to consider only the evidence pertinent to a charged crime and to disregard evidence that was admitted improperly.  (*People v. Yeoman* (2003) 31 Cal.4th 93, 138; *Navarrete*, *supra*, 181 Cal.App.4th at p. 834.)  The presumption that jurors follow instructions has been described in this regard as " '[t]he crucial assumption underlying our constitutional system of trial by jury.' " (*Yeoman*, at p. 139.)  And it is proper to accord weight to jurors' assurances they can follow the law impartially.  (See, e.g.,

13

*People v. Rountree* (2013) 56 Cal.4th 823, 840–841 [crediting jurors' assurances they could be impartial despite exposure to publicity about case]; *People v. Lewis* (2008) 43 Cal.4th 415, 450 [same]; *Odle v. Superior Court* (1982) 32 Cal.3d 932, 946 [trial court is in best position to evaluate jurors' declarations of impartiality]; *People v. Mackey* (2015) 233 Cal.App.4th 32, 83–84 [same].)

An admonition may be inadequate, however, in "exceptional circumstances," an inquiry that depends on the facts of the case. (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.) For example, the jury in *Navarrete* heard inadmissible evidence suggesting the defendant had confessed to the charged crime, a confession that would "eviscerate[] the presumption of innocence" and that "jurors cannot be expected to wipe from their minds." (*Navarrete, supra*, 181 Cal.App.4th at pp. 834–835.) The matter was therefore remanded for a new trial. (*Id.* at pp. 837, 838.) Other opinions reach a similar conclusion on different facts. In one case, where the defendant was on trial for committing a lewd act on a child, a police officer testified that he had questioned the defendant about another case in which he had been a suspect. The trial court struck the statement and admonished the jury to disregard it, but the reviewing court concluded an admonition not to consider the statement did not cure the resulting prejudice, saying it "was no antidote for the poison that had been injected into the minds of the jurors. The defendant stood as one who had been accused of some other sex offense." (*People v. Bentley* (1955) 131 Cal.App.2d 687, 689–691, disapproved on another ground in *People v. White* (1958) 50 Cal.2d 428, 430–431.) The same result was reached in *People v. Allen*, an "extremely close case" that depended on the credibility of the defendant and other witnesses. (*Allen*, at pp. 934–935.) The reviewing court there concluded an admonition did not cure

14

improper testimony that the defendant was on parole. And in *People v. Schiers* (1971) 19 Cal.App.3d 102, 108–109, 114 the court found improper testimony that a lie detector test showed the defendant was lying to be incurably prejudicial.

In other circumstances, cases have held that brief, isolated, or ambiguous references to inadmissible matter did not cause incurable prejudice. (See, e.g., *People v. Collins* (2010) 49 Cal.4th 175, 197–199 ["brief and ambiguous" testimony that defendant made collect calls from "Susanville" before he " 'got out' " could be cured by admonition]; *People v. Valdez* (2004) 32 Cal.4th 73, 128 ["brief and isolated" reference to " 'Chino Institute' " did not require mistrial]; *People v. Bolden* (2002) 29 Cal.4th 515, 555 [brief and fleeting reference to parole office].) And, significantly, our high court has noted the importance of a *timely* admonition to cure prejudice when a jury hears inadmissible evidence. (*Cox*, *supra*, 30 Cal.4th at p. 953 [erroneously offered polygraph evidence].)

On the facts of this case, we conclude it was an abuse of discretion to rely on the admonition as sufficient to cure the prejudice from admission of evidence of the Oakland murder. In no manner can the evidence that defendant murdered Waters be called fleeting or ambiguous. The jury knew defendant was accused of the crime from the moment the prosecutor described in his opening statement how defendant had shot and killed two unarmed men, including specific allegations about the killing of Waters, and the jury heard as the evidence began graphic details from Waters's autopsy. Further along in the trial, the jury heard extensive testimony from Barlow about the circumstances in which defendant was said to have shot Waters in the head in a shocking and unprovoked manner. The jury also heard of the jailhouse attack on Barlow, an act of violence to which defendant admitted in

15

testimony the jury also should never have heard. It was not until a week after Barlow's testimony was played for the jury—after defendant had addressed the Waters murder in his testimony and been subjected to cross-examination about it—that the trial court admonished the jury not to consider the killing of Waters.

The Attorney General points out that the evidence defendant murdered Waters was not strong—indeed, that is why the trial court granted the severance motion at the close of evidence—but the evidence was sufficiently substantial that the trial court at the same time denied a motion for judgment of acquittal. (See Pen. Code, § 1118.1). Thus, the jury heard substantial but inadmissible evidence that defendant committed an unrelated brutal and senseless murder, evidence we conclude was incurably prejudicial in a case where malice is the contested issue.

In reaching this conclusion we do not question the diligence of the judge attempting to mitigate the damage from the jury's exposure to the inadmissible evidence, nor the good faith of jurors who committed to deliberate only on the Hayward homicide. But jurors are human and cannot be expected completely to ignore, in deciding whether or not defendant shot Cunningham in an act of imperfect self-defense or in response to provocation sufficient to negate malice, evidence that on other occasions he murdered a man in cold blood and then beat a witness to that crime. Defendant's chances of a fair trial on the Hayward case were irreparably damaged by the admission of substantial evidence he committed the unrelated Oakland homicide, and it was therefore an abuse of discretion to deny his motion for a mistrial. (See *Edwards*, *supra*, 57 Cal.4th at p. 703.)

We are not persuaded otherwise by the fact the jury acquitted defendant of first degree murder and convicted him only of murder in the

16

second degree for killing Cunningham. It is true that conviction on a lesser charge can " 'strongly suggest[] that the jury was capable of weighing the evidence and differentiating among [the] various charges.' " (*Simon*, *supra*, 1 Cal.5th at p. 130, citing *People v. Lucas* (2014) 60 Cal.4th 153, 217, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19, *People v. Jones* (2013) 57 Cal.4th 899, 927, and *People v. Ruiz* (1988) 44 Cal.3d 589, 607.) But the evidence that defendant premeditated before killing Cunningham was less than overwhelming, a matter reflected in the prosecutor's argument that even if jurors did not think the murder was first degree, he was confident they would all agree it was second degree, and the jury need not "get caught up on first or second degree murder." The success of defendant's position that he was guilty only of voluntary manslaughter, on the other hand, depended largely on the jury accepting his credibility when he testified that Cunningham used a racial slur and lunged toward him and that he was afraid of Cunningham and the dog—credibility that was surely damaged by evidence this was not the first time he shot and killed an unarmed man for no apparent reason. On these facts, the verdict of second degree murder does not show the jury was uninfluenced by the evidence that defendant murdered Waters.

## DISPOSITION

The judgment is reversed. The matter is remanded for retrial.


TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

17

Trial Court:        Alameda County Superior Court

Trial Judge:       Hon. Paul A. Delucchi

Counsel:           J. Courtney Shevelson by appointment of the Court of Appeal under the First Appellate District Project's Independent-Case System for Defendant and Appellant

Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Amit Kurlekar and Melissa A. Meth, Deputy Attorneys General for Plaintiff and Respondent

*People v. Turner* (A159822)

18